**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Robert Lee Walden, Jr., | No. CV 99-559-TUC-RCC |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| vs. | |
| Dora Schriro, et al., | **MEMORANDUM OF DECISION AND ORDER** |
| Respondents. | |

     Petitioner Robert Lee Walden, Jr., filed a Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. The Court has determined that twenty-nine of Petitioner's claims have been properly exhausted. (Dkt. 115.)[1]  In this Order, the Court reviews the merits of those claims.  For the reasons set forth herein, the Court concludes that Petitioner is not entitled to relief.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

     In May and June of 1991, Petitioner worked for Arizona Chemical Company, a pest control business.[2]  He was on the job at the time he committed the crimes described below.

---

    [1]  "Dkt." refers to the documents in this Court's case file.

    [2]  Except where otherwise indicated, this factual summary is taken from the Arizona Supreme Court opinion upholding Petitioner's convictions and sentences.  *State v. Walden*,

On May 4, 1991, Petitioner was standing near the pool in an apartment complex when Vicki Blanar approached her friend's apartment. No one answered when Blanar knocked on the door and she returned to her car. A few minutes later, Blanar went back to the door and knocked; again there was no answer. As she walked away from the apartment, Petitioner came up behind her, put a knife to her throat, and forced her into the complex laundry room under threat of death. He ordered her to take off her clothes and to perform fellatio on him, both of which she refused. Petitioner removed her clothing and with the knife to her throat, he touched her breasts and had intercourse with her. Petitioner threatened to kill her if she left the room; he left and returned to the room twice. When Petitioner left for the third time, Blanar ran to her car and drove home. Blanar was examined at the emergency room; the semen analysis could not exclude Petitioner as her rapist. Over the course of several weeks, Blanar reviewed numerous six-photo lineups; she identified Petitioner as her attacker from lineup fourteen. (RT 7/16/92 at 51, 64; RT 7/14/92 at 227-28.)[3] She also identified Petitioner at trial. (RT 7/14/92 at 219.)

On May 15, 1991, just after Kristina Velasco arrived home (RT 7/15/92 at 167-68), Petitioner knocked on her apartment door and told her he was there to work on her plumbing. Petitioner was dressed in blue pants and a red shirt, the work uniform for Arizona Chemical. When Petitioner asked her to come upstairs with him, she became suspicious and picked up the phone to call a friend. Petitioner grabbed her, threatened to kill her, and tried to wrap the phone cord around her neck. She fought against him and he forced her into the downstairs bathroom, where he tried to wrap a hairdryer cord around her neck. Petitioner then dragged

---

183 Ariz. 595, 905 P.2d 974 (1995), *overruled in part by State v. Ives*, 187 Ariz. 102, 927 P.2d 762 (1996).

[3] "RT" refers to the reporter's transcripts from Petitioner's state court proceedings. "ROA" refers to the four-volume record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-92-0530-AP). The state court original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court on May 18, 2001. (Dkt. 62.)

her upstairs while threatening to kill her.  Petitioner tied up Velasco, gagged her, and blindfolded her.  He ripped her shirt and bra and removed her shoes and jeans before touching her breasts, penetrating her with his fingers, and having intercourse with her. Petitioner then re-tied her and threatened to kill her if she reported the assault.  He went downstairs where she could hear his keys jingling, then returned to the bedroom and ran something down her back that he said was a knife.  He left the room and she heard the front door open and close, but he returned to the upstairs bedroom and told her he was watching her.  When he finally left, she ran to the apartment manager's office.  She was examined at the emergency room and abrasions were noted on her face, back, and wrists.  An analysis of the semen stains could not exclude Petitioner as her rapist.  Two fingerprints found on the tennis shoes Velasco was wearing at the time she was attacked were matched to Petitioner. (RT 7/17/92 at 150, 157.)  Velasco identified Petitioner as her attacker in a six-photo lineup before trial and identified him at trial.  (RT 7/14/92 at 7, 10; RT 7/16/92 at 13-14.)

Around 1:30 p.m. on June 13, 1991, Elaine Jordan saw Petitioner wearing a uniform and carrying some equipment in the Desert Sage apartment complex.  The complex is next to the one where Velasco lived and was assaulted, and was very close to Petitioner's apartment.  Miguela Burhans was also seen heading towards the Desert Sage complex, in which she lived, at approximately 1:30 p.m.  (RT 7/16/92 at 110.)  Just after 2:30 p.m., Burhans's husband returned to their apartment and found the door open.  He discovered his wife's body in the bedroom, naked from the waist down, in a pool of blood.  His wife had bruises and injuries on her arms, legs, and mouth, as well as scrapes on her neck and chest. She had been hit on the head.  She died from strangulation and two deep throat wounds. Petitioner could not be ruled out as the source of the semen found in the victim.  His fingerprint was found on a nightstand in the victim's bedroom.

On July 31, 1992, a jury convicted Petitioner of the following offenses:  dangerous kidnapping, dangerous aggravated assault, sexual abuse, and sexual assault arising out of his attack on Blanar; burglary, kidnapping, sexual abuse, two counts of sexual assault, and robbery for his attack on Velasco; and dangerous burglary, dangerous kidnapping, sexual

assault, and first degree murder for the attack on Burhans.  Pima County Superior Court Judge James C. Carruth sentenced Petitioner to death for the murder and to prison terms for the other offenses.  On direct review, the Arizona Supreme Court affirmed Petitioner's convictions and sentences. *State v. Walden*, 183 Ariz. 595, 905 P.2d 974 (1995), *overruled in part by State v. Ives*, 187 Ariz. 102, 927 P.2d 762 (1996).  Petitioner filed a petition for post-conviction relief (PCR) with the trial court on September 30, 1996.  The court dismissed the petition on January 9, 1997.  On January 9, 1998, Petitioner filed a second PCR petition, which was dismissed on January 5, 1999.  Petitioner filed a Petition for Review to the Arizona Supreme Court from the denial of his second PCR petition.  It was summarily denied on March 30, 1999.

Petitioner filed his original petition in this case on November 10, 1999, and an amended petition on August 16, 2000.  (Dkts. 1, 21.)  This Court granted a partial stay of the case from September 19, 2002, through July 12, 2004, while Petitioner pursued relief in state court based on *Ring v. Arizona*, 536 U.S. 584 (2002).  (Dkts. 79, 99.)  After the Court ruled on the procedural status of Petitioner's claims (Dkt. 115), the parties briefed the merits of the remaining claims (Dkts. 124, 131, 137).

### <u>LEGAL STANDARD FOR RELIEF UNDER THE AEDPA</u>

The Antiterrorism and Effective Death Penalty Act (AEDPA) established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable

1    application of, clearly established Federal law, as determined by the Supreme
     Court of the United States; or
2
     (2) resulted in a decision that was based on an unreasonable determination of
3    the facts in light of the evidence presented in the State court proceeding.

4    28 U.S.C. § 2254(d).  The relevant state court decision is the last reasoned state decision

5    regarding a claim.  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v.*

6    *Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664

7    (9th Cir. 2005).

8         "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule

9    of law that was clearly established at the time his state-court conviction became final."

10   *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

11   (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

12   the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

13   of the holdings of the Supreme Court at the time the petitioner's state court conviction

14   became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006);

15   *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if

16   the Supreme Court has not "broken sufficient legal ground" on a constitutional principle

17   advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529

18   U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir.

19   2004).  Nevertheless, while only Supreme Court authority is binding, circuit court precedent

20   may be "persuasive" in determining what law is clearly established and whether a state court

21   applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

22        The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

23   The Court has explained that a state court decision is "contrary to" the Supreme Court's

24   clearly established precedents if the decision applies a rule that contradicts the governing law

25   set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

26   Supreme Court on a matter of law, or if it confronts a set of facts that is materially

27   indistinguishable from a decision of the Supreme Court but reaches a different result.

28   *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In

1    characterizing the claims subject to analysis under the "contrary to" prong, the Court has

2    observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

3    facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

4    clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir.

5    2004).

6        Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

7    may grant relief where a state court "identifies the correct governing legal rule from [the

8    Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

9    "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

10    where it should not apply or unreasonably refuses to extend that principle to a new context

11    where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's

12    application of Supreme Court precedent "unreasonable," the petitioner must show that the

13    state court's decision was not merely incorrect or erroneous, but "objectively unreasonable."

14    *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

15        Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

16    court decision was based upon an unreasonable determination of the facts.  *Miller-El v.*

17    *Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

18    determination will not be overturned on factual grounds unless objectively unreasonable in

19    light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340

20    (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).   In

21    considering a challenge under § 2254(d)(2), state court factual determinations are presumed

22    to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and

23    convincing evidence."  28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El*

24    *II*, 545 U.S. at 240.

25                              **DISCUSSION**

26    **SEVERANCE – CLAIM 1**

27        Petitioner alleges that the trial court erred when it denied his request to sever each of

28    the two rape counts and the murder count from one another for trial purposes; at a minimum,

he contends, the murder charge should have been tried separately.  Petitioner argues that the incidents did not meet the criteria for joinder, and that joinder of the counts prejudiced him and violated his right to a fair trial.  Petitioner alleges prejudice because "the risk that a jury used evidence of rape to infer criminal disposition towards murder was great," and that the association of the sexual assaults and the murder probably created negative feelings towards him.  (Dkt. 124 at 4-5.)

The Arizona Supreme Court held that joinder was proper under Arizona law because there was a "visual connection" between the crimes – i.e., similarities existed where one would expect to find differences.  *Walden*, 183 Ariz. at 605, 905 P.2d at 984.  Further, the court stated that each of the sexual assaults would have been admissible in the separate trials of the other offenses if severance had been granted.  *Id.* at 606, 905 P.2d at 985.

On habeas review, the propriety of the joinder of criminal counts "rests within the sound discretion of the state trial judge."  *Fields v. Woodford*, 309 F.3d 1095, 1110 (9th Cir. 2002).  The denial of severance is only of constitutional magnitude if it is so prejudicial as to deny a defendant a fair trial.[4]  *United States v. Lane*, 474 U.S. 438, 446 & n.8 (1986).  Therefore, this Court reviews not whether joinder was proper under Arizona law, which is the focus of Petitioner's argument, but whether the denial of severance was so prejudicial as to violate Petitioner's constitutional rights.  *See Grisby v. Blodgett*, 130 F.3d 365, 370 (1997) ("We do not depend on the state law governing severance in state trials.").  To establish the requisite level of prejudice, a petitioner must show that the impermissible joinder "had a substantial and injurious effect or influence in determining the jury's verdict."  *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).  Petitioner has failed to do so.

First, the Arizona Supreme Court held that, under state law, each of the sexual assaults would have been admissible in separate trials of each incident.  *See Walden*, 183 Ariz. at 606,

_____

[4]  Petitioner describes this claim as not only an issue of due process, but also of his right to an impartial jury under the Sixth Amendment; however, he cites no caselaw framing this as a Sixth Amendment claim.  The Court, therefore, assesses it strictly as a due process issue.

905 P.2d at 985. Although Petitioner contests this ruling, it is not this Court's role to review state law decisions on state law issues. *See Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). The cross-admissibility of the evidence from each incident significantly reduced any potential prejudice from joinder of the counts. *See Davis*, 384 F.3d at 638-39.

Second, contrary to Petitioner's argument in this Court (Dkt. 124 at 6), and although not requested by Petitioner at trial (ROA 260-74), the jury was given an instruction requiring individual consideration of each charge. Specifically, the jury was instructed that the "State must prove every part of each charge beyond a reasonable doubt. Each count contains a separate charge. The defendant may be convicted or acquitted on either. You must decide each charge on the evidence and law applicable to it uninfluenced by your decision as to the other charges." (ROA 279.) Jurors are presumed to follow instructions given by the court. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Such instruction limited any prejudice from the joinder. *See Davis*, 384 F.3d at 639; *Comer v. Schriro*, 463 F.3d 934, 958 (9th Cir. 2006).

Third, Petitioner does not allege he was prejudiced because the jury may have confused the evidence relevant to each count, *see Comer*, 463 F.3d at 958 (when specific evidence as to each crime is presented there is less risk of juror confusion); in fact, he contends the evidence as to each count was distinct (Dkt. 124 at 7). Nor does he allege prejudice because one of the incidents was supported by significantly weaker evidence than the other counts. *See Davis*, 384 F.3d at 639 (finding joinder of a strong evidentiary case with a weak one relevant to prejudice analysis); *Bean v. Calderon*, 163 F.3d 1073, 1085 (9th Cir. 1998) (finding prejudice based on significant disparity in evidence of guilt in the joined crimes). The State's case against Petitioner was strong as to each incident. Petitioner was identified by both sexual assault victims, an eyewitness identified Petitioner as present in the area of the murder victim's apartment around the time of the murder, and his fingerprint was found on the shoe of one of the sexual assault victims and on a nightstand in the bedroom where the murder occurred. In light of the strength of the evidence, Petitioner has failed to demonstrate that the joinder had a substantial influence on the verdict. *Davis*, 384 F.3d at

638; *Lane*, 474 U.S. at 450 (misjoinder harmless when the evidence of guilt is overwhelming).

The Arizona Supreme Court's denial of this claim was not an unreasonable application of Supreme Court law.  Claim 1 is denied.

## PRETRIAL IDENTIFICATIONS – CLAIM 2

Petitioner alleges that the pretrial and in-court identifications of him by the victims, Vicki Blanar and Kristina Velasco, and eyewitnesses, Lynn Carrico and Elaine Jordan, were unduly suggestive, unreliable, and impermissibly tainted.  The core of his claim as to each of the witnesses is that the six-photo lineup used by the police was in itself suggestive because, according to Petitioner, the other five men pictured had significant physically distinguishable characteristics from Petitioner.   Petitioner makes additional specific arguments as to each witness:  Blanar and Velasco were informed that the person they selected from the photo lineup was in custody, tainting their in-court identification; Jordan did not identify Petitioner until after an off-record conversation with the detective; and Carrico could not make a positive photo identification but identified him at a pretrial hearing.

Background

Petitioner filed a motion to suppress the pretrial and in-court identifications by Blanar, Velasco, Carrico, and Jordan.  (ROA 87-94.)  The trial court held a multi-day hearing on the motion.  (RT 7/10/92; RT 7/13/92; RT 7/14/92 at 3-29.)  In denying the motion, the court stated:

> Well, with regard to the identification procedures employed with the witness Lynn Carrico and Elaine Jordan, the Court finds there was no unlawful means used by the police officers and that the identifications were not unlawfully obtained.
>
> With regard to the witnesses Blanar and Velasco, it's abundantly clear their ability to make the identification in question was not produced by any police activity, is instead the product of their painfully clear recollections of their experiences, and in any case, I find that the police procedures used were not at all inappropriate.
>
> I don't agree with [defense counsel's] characterization of Exhibit 6. Appears to me to be a group of responsibly chosen photographs. The motion is denied in its entirety.  Of course, these points, if you wish, can be argued to the trier.

1  (RT 7/14/92 at 39; *see also* ROA 168.)  The jury was instructed that to consider a witness's

2  in-court identification it had to find beyond a reasonable doubt that the identification was

3  based on the witness's independent recollection not any suggestive circumstances.  (ROA

4  283.)

5          The Arizona Supreme Court denied Petitioner's claim regarding the identifications

6  and found that the photos used in the lineup "resembled one another.  All were similar in age,

7  build, hair color, and hair length.  In fact, it is not readily apparent which one Walden

8  believes is Hispanic-looking.  The fact that two had blue eyes and different complexions is

9  inconsequential."  *Walden*, 183 Ariz. at 606, 905 P.2d at 985.  The court further concluded

10  that telling Blanar and Velasco that Petitioner was in custody, after they had identified him,

11  and giving Velasco a newspaper article about Petitioner's arrest did "not render the

12  procedure unduly suggestive."  *Id.*

13          The Arizona Supreme Court similarly held that Jordan's identification of Petitioner

14  was not unduly suggestive.  *Id.*  The court made the following findings:

15          Elaine [Jordan] saw two men that day at the apartment complex.  One
    stood out because he had been acting strangely, and she made a mental note
16  of it.  When she heard about the murder, she called the police.  After viewing
    the photographic lineup (the same one shown to Vicki and Kristina), Elaine
17  indicated that the person in the number two position, which was not Walden,
    "looked very similar to the person [she] saw."  She said that his eyes and
18  complexion were similar but that his nose was different.  Believing they were
    finished, the officer turned the tape off.  Elaine, still looking at the
19  photographs, then indicated that although some of the pictures looked similar
    to the man who had acted strangely, she had definitely seen the man pictured
20  in the number five position, which was Walden.  She stated that he had looked
    like a maintenance person or was "doing something in the yard" of the
21  complex.  She also stated that Walden had some type of equipment with him.

22          The officer immediately turned the tape recorder back on.  She
    explained on the tape what had just happened, and Elaine confirmed it.  At the
23  *Dessureault* hearing, both Elaine and the officer verified that the tape
    accurately reflected what had occurred off-tape.  Walden did not offer any
24  evidence to rebut their testimony.  Nor did he elicit on cross-examination
    anything that would contradict this explanation of the off-tape conversation.
25  We are satisfied that Elaine Jordan did not take part in a suggestive
    identification procedure and hold that the trial court did not err by allowing her
26  to identify Walden at trial.

27  *Walden*, 183 Ariz. at 606-07, 905 P.2d at 985-86.

28

1          Analysis

2          Evaluating whether an identification has been irreparably tainted by a suggestive

3    procedure requires a two-part analysis.  First, the Court must determine whether the

4    challenged procedure was suggestive.  *Neil v. Biggers*, 409 U.S. 188, 381 (1972).  "An

5    identification procedure is suggestive when it 'emphasize[s] the focus upon a single

6    individual' thereby increasing the likelihood of misidentification."  *United States v.*

7    *Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998) (quoting *United States v. Bagley*, 772 F.2d

8    482, 493 (9th Cir. 1985)).  Second, if the process was suggestive, the Court must examine

9    the totality of the circumstances to determine whether the witness's identification is

10   nonetheless reliable.  *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).  The factors to be

11   considered in assessing reliability are:  (1) the witness's opportunity to view the accused at

12   the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the

13   description, (4) the witness's level of certainty, and (5) the length of time between the crime

14   and the confrontation.  *Id.* (citing *Biggers*, 409 U.S. at 199-200).  The ultimate question is

15   whether, in light of all the circumstances, the identification procedure "was so impermissibly

16   suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

17   *Simmons v. United States*, 390 U.S. 377, 384 (1968).

18         Petitioner's central argument regarding the pretrial and in-court identifications as to

19   all of these witnesses is that they picked him from a lineup of six photos and the other five

20   photos were of people with significantly distinguishable physical characteristics.  As noted,

21   the Arizona Supreme Court made factual findings about the lineup, specifically that the

22   persons in the photos "resembled one another" and "were similar in age, build, hair color,

23   and hair length."  *Walden*, 183 Ariz. at 606, 905 P.2d at 985.  Further, the court found

24   inconsequential the fact that two of the persons had blue eyes and varying complexions.  *Id.*

25   Petitioner has not even attempted to overcome these findings with clear and convincing

26   evidence as required by the AEDPA.  *See* 28 U.S.C. § 2254(e)(1).

27         This Court's review of the lineup (Dkt. 156, Trial Ex. 65) accords with the Arizona

28   Supreme Court's assessment – the photos generally resemble one another, *see United States*

1   *v. Barron*, 575 F.2d 752, 755 ("it would be unduly burdensome to require police officials to

2   find five or six very similar individuals for a lineup."), and were not suggestive in light of

3   the descriptions of the attacker given by the victims and witnesses.  Contrary to Petitioner's

4   argument, none of the people have a distinctly non-Caucasian complexion, and the variations

5   in skin tone are not significant.  *See United States v. Portillo*, 633 F.2d 1313, 1324 (9th Cir.

6   1980) (finding photographic lineup not suggestive, even though only two of the six photos

7   were persons of Mexican descent, because other persons were not so distinct as to single out

8   the defendant and "reasonable people can differ as to what makes a person appear to be

9   Spanish, Mexican, Indian, Italian," etc.).  Nothing about the photographic lineup emphasizes

10  the photo of Petitioner.   In sum, the Arizona Supreme Court's conclusion that the

11  photographic lineup was not suggestive was not an unreasonable application of Supreme

12  Court law.

13       The Court will now address Petitioner's specific arguments with respect to each

14  witness, taking into account the *Biggers* factors.

15       *Vicki Blanar*

16       Petitioner asserts that Blanar's pretrial photographic identification of Petitioner and

17  her in-court identification were both so impermissibly suggestive as to violate due process.

18  The only basis for this contention is the photo lineup itself.  As discussed above, this Court

19  has determined that the lineup was not suggestive.  Even if it was suggestive, the use of the

20  identification did not violate Petitioner's due process rights unless it was unreliable, based

21  on the totality of the circumstances using the factors set forth in *Biggers*,[5] and gave rise to

22  a very substantial likelihood of irreparable misidentification.

23       Blanar had several opportunities in daylight to view her attacker's face, which was not

24  covered, during the approximately fifteen minutes the attack lasted.  (RT 7/13/92 at 9, 11-13;

25

26       [5] Petitioner puts forth no argument that Blanar's identifications are unreliable when

27  assessed under the *Biggers* factors.  The entirety of his argument is based on the quality of
    the photographic lineup and the detective's commentary to Blanar after she identified

28  Petitioner from the photos.

RT 7/14/92 at 214.)  As the victim, Blanar certainly gave close attention to her attacker, although she was scared and he was armed with a knife.  *See Biggers*, 409 U.S. at 200 ("She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes.").  Blanar accurately described her attacker as having brown curly hair, brown eyes, and a fair complexion, as being approximately six foot three inches tall, and as having no distinguishing facial features.  (RT 7/15/92 at 22-23, 41.)  Blanar testified that she had no doubt about her identification of Petitioner in the lineup (RT 7/13/92 at 16), and she identified him without hesitation at trial (RT 7/14/92 at 219).

Approximately two months passed between the assault and Blanar's identification of Petitioner in the photo lineup (RT 7/13/92 at 4, 25); however, she had not previously identified a suspect.  *See Barron*, 575 F.2d at 755 (finding two months between the crime and identification not inconsistent with reliability when witness has made no intervening identification of another suspect).  Finally, Blanar was shown thirteen lineups before she identified Petitioner in the fourteenth (RT 7/15/92 at 7); thus, she was clearly capable of resisting any potential suggestiveness and making a reliable identification.  *See Biggers*, 409 U.S. at 201 (reliability enhanced by the fact that, although seven months had passed, the victim had viewed numerous lineups, showups, and photographs and the defendant was the first person she had identified).  Although Blanar's pretrial identification of Petitioner took place just before midnight after she had consumed a few beers, this procedure was justified because the police wanted Blanar to have an opportunity to see Petitioner's photo in a lineup before it was published in the paper upon his arrest.  *See Simmons*, 390 U.S. at 384-85 (considering in the totality of circumstances the FBI's need to conduct a rapid photographic identification).

Additional factors contributed to the reliability of Blanar's pretrial identification of Petitioner.  Blanar was not informed that a suspect was included in the photos, the detective did not emphasize Petitioner's picture in any way, and no other witnesses were present for the lineup process.  *See United States v. Monks*, 774 F.2d 945, 957 (9th Cir. 1985).  These circumstances offset any negative effect arising from the lineup's inclusion of persons

1   dissimilar in appearance from Petitioner.

2          After assessing the totality of the circumstances, the Court determines that Blanar's

3   pretrial identification was reliable and the procedures used with her were not so

4   impermissibly suggestive as to give rise to a very substantial likelihood of irreparable

5   misidentification during the photographic lineup.

6          Petitioner also contends that the in-court identification was suggestive based not only

7   on the photo lineup but also the fact that, after Blanar identified Petitioner from the

8   photographs, the detective informed her that the person she had selected was in custody. (RT

9   7/13/92 at 17.) The detective's limited, after-the-fact commentary, which did not specify that

10  the person was in custody for the attack against Blanar, did not render the in-court

11  identification impermissibly suggestive. The Court has assessed Blanar's identification and

12  found it sufficiently reliable given the totality of the circumstances. The fact that Blanar was

13  informed the person she identified was in custody does not affect this assessment. *Cf. United*

14  *States v. Jarrad*, 754 F.2d 1451, 1455 (9th Cir. 1985) (giving little weight to detective's

15  comment that "they were in custody"); *Barron*, 575 F.2d at 755 (finding post-identification

16  affirming actions by police to have minimal impact on reliability of in-court identification

17  because there was "no indication that any of the witnesses received prompting prior to their

18  selections."); *United States v. Higginbotham*, 539 F.2d 17, 23 (9th Cir. 1976) ("The mere

19  suggestion that the accused committed the crime" does not rise to the level of a due process

20  violation, which requires an impermissible suggestion). The Court finds that Blanar's in-

21  court identification was reliable – there was not a very substantial likelihood of irreparable

22  misidentification due to suggestive pretrial procedures. *See United States v. Domina*, 784

23  F.2d 1361, 1368 (9th Cir. 1986) (noting that concern regarding in-court identifications is

24  whether it is based on a suggestive pretrial procedure rather than observations at the time of

25  the crime).

26          *Kristina Velasco*

27          Petitioner asserts that Velasco's pretrial photographic identification of Petitioner and

28  her in-court identification were both so impermissibly suggestive as to violate due process.

1   Again, the only basis for Petitioner's contention that the pretrial photographic lineup was

2   suggestive was the photo lineup itself.  The Court has rejected this argument.  Even if the

3   lineup was suggestive, if it is reliable based on the totality of the circumstances, then the

4   identification does not violate Petitioner's due process rights.

5          Once the attack began, Velasco stated that she did not look at her attacker straight on

6   because she feared for her life and, for the later part of the attack, he blindfolded her.  (RT

7   7/14/92 at 7, 15.)  However, Velasco had the opportunity to observe Petitioner up close in

8   the daylight during a brief conversation when he first came to her door, and she saw him

9   again in the light of her apartment after he entered.  (*Id.* at 4-5.)  She also testified that she

10  got a good look at his face reflected in her downstairs bathroom mirror, and she saw his face

11  again in the upstairs bathroom mirror.  (*Id.* at 6; RT 7/15/92 at 125-26.)   As the victim,

12  Velasco certainly was paying closer attention than a passing witness and made a point to look

13  at her attacker in the mirror when she had the opportunity.  *See Biggers*, 409 U.S. at 200.

14  Velasco accurately described her attacker as white and clean cut, with a light complexion,

15  short wavy brown hair, and dark eyes.  (RT 7/15/92 at 162, 175, 181.)  She also told the

16  police her attacker was five feet and ten or eleven inches tall, weighed 170 or 180 pounds,

17  and was twenty-two or twenty-three years old.  (*Id.* at 161.)  Those descriptions were fairly

18  accurate – Petitioner was in fact a few inches taller than that, slightly heavier, and twenty-

19  four years old.  Velasco initially told the police she was not sure if she would be able to

20  identify her attacker, because she was scared due to his threat that he would kill her if she

21  reported him.  (*Id.* at 171-72.)  However, Velasco testified that she had no doubt about her

22  identification of Petitioner from the photo lineup and in-court.  (RT 7/14/92 at 11; RT

23  7/15/92 at 151, 153-54.)  Finally, her identification of Petitioner in the photo lineup took

24  place within a relatively short time frame, only a month after the attack.

25         As with Blanar, Velasco was not informed that a suspect was in the photos or that

26  someone had identified anyone from that lineup, no other witnesses were present when she

27  made her identification, and Petitioner's photo was not emphasized by the detective.  All of

28  these facts, in addition to the factors assessed above, outweigh any suggestive features of the

1   photo lineup.  *See Monks*, 774 F.2d at 957.  The Court finds that, based on the totality of

2   circumstances, Velasco's pretrial identification of Petitioner was reliable and did not give rise

3   to a substantial likelihood of irreparable misidentification.

4     Petitioner also contends that Velasco's in-court identification was suggestive because

5   after Velasco identified Petitioner from the photographs, the detective informed her that the

6   person she had identified had been arrested  (RT 7/14/92 at 11) and he gave her a newspaper

7   article reporting Petitioner's arrest (RT 7/15/92 at 184).   Based on the totality of the

8   circumstances, including the factors set forth in *Biggers*, the Court has determined that

9   Velasco's identification of Petitioner was reliable.  For these reasons, and applying the same

10  law as discussed with respect to Blanar, the Court's analysis is not altered by the detective's

11  limited comments after the pretrial identification process was complete.  The Court finds that

12  Velasco's in-court identification of Petitioner was reliable and not impermissibly suggestive.

13  *See Domina*, 784 F.2d at 1368.

14    *Elaine Jordan*

15    Petitioner asserts that Jordan's pretrial photographic identification of him and  her in-

16  court identification were both so impermissibly suggestive as to violate due process.   As

17  already discussed, the Court rejects Petitioner's contention that the pretrial photographic

18  lineup was suggestive.

19    Petitioner also contends the pretrial identification was suggestive based on what may

20  have taken place when the tape recorder was turned off prior to Jordan's identification of

21  Petitioner.  As set forth in the Arizona Supreme Court's opinion, Jordan initially told the

22  police that she had seen a man acting strangely at the apartment complex on the day Burhans

23  was murdered.  When she was asked to look at the photo lineup, she indicated that the person

24  in position two looked similar to the person she had seen acting strangely.  The detective then

25  turned off the tape recorder.  While the tape recorder was off, Burhans volunteered that she

26  had definitely seen the person in position five at the complex that day, and that he had looked

27  like a maintenance person.  The detective then turned the tape back on and they went over

28  what had taken place while the recorder was off.  *Walden*, 183 Ariz. at 606-07, 905 P.2d at

985-86.

In his attempt to make this procedure seem particularly "pernicious" (Dkt. 124 at 20), Petitioner misrepresents the facts. Specifically, he asserts that when Jordan identified Petitioner she indicated that he was the suspicious-acting person she saw that day. (*Id.* at 19-20.) This suggests that she did not identify him as the suspicious individual upon her initial review of the photos, but did so after the tape recorder had been turned off. In fact, in Jordan's testimony she clarified several times that she saw two different people that day, the person she thought was suspicious and Petitioner, who she thought was a maintenance man. (RT 7/10/92 at 74-75, 77, 80, 86-87, 96-97; RT 7/16/92 at 122, 157-58.) When Jordan initially reviewed the photos she was attempting to identify the person she thought was acting suspiciously. (RT 7/19/92 at 87, 96-97.) It was only after the tape recorder was turned off that she determined she also saw the person in position five of the photographic lineup that day. She did not change her mind and decide that the person in position five of the lineup was the suspicious-looking individual she was initially trying to identify; rather, she identified Petitioner as another individual she saw that day at the apartment complex.

Petitioner's argument about Jordan's pretrial identification boils down to this statement: "It is simply too difficult to accept, in terms of due process, that Ms. Jordan could go from not recognizing Mr. Walden at all prior to the tape being turned off to being able to make a positive identification of him after the tape resumed." (Dkt. 137 at 7.) This conclusory allegation is far from the clear and convincing evidence necessary under 28 U.S.C. § 2254(e)(1) to overcome the presumed correctness of the Arizona Supreme Court's findings of fact – i.e., that the detective and Jordan testified accurately about what happened while the recorder was off and that no facts supported the contention that the procedure used was suggestive. *Walden*, 183 Ariz. at 607, 905 P.2d at 986. In sum, Petitioner has not established that the pretrial identification procedure was suggestive. Further, because the pretrial identification was the sole basis for Petitioner's contention that Jordan's in-court

1    identification was suggestive,[6] that allegation also fails.

2    　　　Even if the photographic lineup and/or the actions of the detective were determined

3    to be suggestive, the identification would not violate due process unless it was unreliable in

4    light of the totality of the circumstances.[7]  Jordan viewed Petitioner from about a foot away,

5    outdoors on a partly sunny day, with nothing obscuring her view of his face.  (RT 7/10/92

6    at 99.)  She testified that she got a good look at him for the approximately fifteen seconds it

7    took to walk past him.  (*Id.* at 100.)  While Jordan admitted that nothing about Petitioner's

8    appearance led her to believe it was important to remember him, she did say "hi" to him, was

9    struck by the fact that he was fairly good looking, and described the way he looked at her as

10   sexual.  (*Id.* at 75, 87, 100, 101.)  Because Jordan believed another person at the apartment

11   complex was acting suspiciously, and she did not note anything strange about Petitioner's

12   behavior, she did not report having seen Petitioner until she identified him in the

13   photographic lineup (RT 7/16/92 at 157-58); therefore, there is no pre-identification

14   description to assess for accuracy.  Jordan expressed certainty over her pretrial and in-court

15   identification of Petitioner.  (RT 7/10/92 at 74, 97; RT 7/16/92 at 159.)  Just under a month

16   passed between the day of the crime and Jordan's identification of Petitioner.  (RT 7/16/92

17   at 117, 149.)

18   　　　After assessing the totality of the circumstances, the Court determines that the

19   procedures used with Jordan were not so impermissibly suggestive as to give rise to a very

20   substantial likelihood of irreparable misidentification during the photographic lineup or the

21   _____

22   　　　[6]  With citation notably absent, Petitioner alleges in his Merits Brief that Jordan's in-
23   court identification was suggestive because Detective Wright informed her that Petitioner
      was in custody and emphasized Petitioner's photo.  (Dkt. 124 at 9 n.9, 20.)  No testimony
24   supports that assertion.  In fact, Jordan testified that, "much later" than the photographic
      lineup identification, Detective Godoy told her "someone had been arrested," not that the
25   person she identified had been arrested.  (RT 7/10/92 at 91.)  Further, Jordan and Detective
26   Wright testified that Wright did not suggest that Jordan should identify the person in position
      number five of the lineup, nor did she point that person out.  (*Id.* at 77; RT 7/22/92 at 172.)

27

28   　　　[7]  As with Blanar, Petitioner makes no argument that Jordan's identification of
      Petitioner fails as unreliable under the *Biggers* factors.

- 18 -

1   in-court identification.

2       *Lynn Carrico*

3       Petitioner disputes the reliability of Carrico's identification of Petitioner. However,

4   no identification by Carrico was admitted at trial, neither a pretrial nor in-court identification.

5   (RT 7/14/92 at 149-74.) Thus, whether any of her identifications were suggestive or gave

6   rise to a very substantial likelihood of irreparable misidentification is irrelevant because that

7   information was not admitted before the jury. *See Hensley v. Carey*, 818 F.2d 646, 650 (7th

8   Cir. 1987) (*Brathwaite* is a procedural safeguard for admission of reliable trial evidence;

9   there is no right to an impartial lineup if the resulting evidence is not used at trial).

10      In his Reply Brief, Petitioner alters his argument to contend that the description

11  Carrico gave to the jury of the man she saw was tainted by her improper identification of

12  Petitioner during a pretrial hearing. (Dkt. 137 at 6-7.) First, this Court will not entertain this

13  issue because it is improper for Petitioner to urge a new argument in his Reply, the claim was

14  not exhausted, and Respondents have had no opportunity to reply to it. *See* Rule 2, Rules

15  Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring all grounds for relief to be

16  included in the petition); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).

17  Second, Petitioner cites no law to support his new argument that a criminal defendant is

18  entitled to the same protections from a "tainted" description as would apply to an

19  identification. Whether a witness's description of a person has changed over time is readily

20  challenged on cross-examination, as Carrico's description was in this case. (RT 7/14/92 at

21  163-74.)

22      *Conclusion*

23      No identification by Carrico was admitted at trial, therefore, Petitioner has not put

24  forth a constitutional claim relative to her. The Court finds that the identification procedures

25  used with Blanar, Velasco, and Jordan were not suggestive. If suggestive, each of their

26  identifications, both pretrial and in-court, were reliable and not so impermissibly suggestive

27  as to give rise to a very substantial likelihood of irreparable misidentification. Therefore, the

28  Arizona Supreme Court's denial of this claim was not an unreasonable application of

1   Supreme Court law.  Claim 2 is denied.

2

3               **FAILURE TO PRESERVE EVIDENCE – CLAIM 3**

4         Petitioner alleges that his right to a fair trial and the presumption of innocence under

5   the Sixth and Fourteenth Amendments was violated by the trial court's failure to dismiss the

6   counts relating to victim Velasco because the State failed to preserve a vaginal swab from

7   her sexual assault kit.

8         As set forth by the Arizona Supreme Court, sexual assault kits are supposed to have

9   a vaginal swab and a vaginal smear in them.  *Walden*, 183 Ariz. at 607 n.4, 905 P.2d at 986

10  n.4.  Neither the doctor who performed Velasco's examination, nor the nurse who was

11  present, could remember whether the swab was thrown away or placed in the kit.  *Id.*  When

12  the police criminalist broke the original seal on the kit there was no swab in it.  *Id.*  The

13  Arizona Supreme Court denied this claim on direct appeal based on *Arizona v. Youngblood*,

14  488 U.S. 51, 58 (1988), because Petitioner conceded that the State did not act in bad faith.

15  *Walden*, 183 Ariz. at 607, 905 P.2d at 986.

16        In *Youngblood*, the Court held that absent a showing of bad faith on the part of the

17  police, "failure to preserve potentially useful evidence does not constitute a denial of due

18  process of law."  488 U.S. at 58.  The duty to preserve evidence is limited to "evidence that

19  might be expected to play a significant role in the suspect's defense," which requires that the

20  "evidence must both possess an exculpatory value that was apparent before the evidence was

21  destroyed, and be of such a nature that the defendant would be unable to obtain comparable

22  evidence by other reasonably available means."  *California v. Trombetta*, 467 U.S. 479, 488-

23  89 (1984).  The bad faith requirement of *Youngblood* hinges on whether the government had

24  knowledge of the exculpatory value of the evidence before its destruction.  *See United States

25  v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993).

26        First, Petitioner has not proven that the vaginal swab at issue was ever in possession

27  of the police.  Rather, officer Quentin Peterson testified that when he opened the sexual

28  assault kit and conducted an inventory, which was the first time it had been opened since

1  having been originally sealed at the hospital, there was no swab in the kit.  (RT 7/8/92 at 33,

2  34.)  Second, the fact that a particular piece of evidence "could" exculpate a defendant if

3  preserved and tested does not satisfy *Trombetta*; instead, the police must actually know it is

4  of exculpatory value.  *Youngblood*, 488 U.S. at 56 n.*.  There is no dispute that the swab was

5  never tested, therefore, the police had no knowledge of whether it was exculpatory.  Further,

6  Criminalist Alan Hatch testified that he usually finds more genetic markers in sexual assault

7  cases from the crotch of the victim's panties than from a vaginal swab because the material

8  has not been subjected to as much bacterial activity.  (RT 7/8/92 at 65.)  Thus, there is no

9  reason to believe that more evidence would have been uncovered by testing the swab than

10  was available by testing of the panties, which were available to Petitioner.

11       No testimony indicated that the failure to follow standard procedure or the loss of the

12  swab was more than inadvertence or negligence.  (RT 7/8/92 at 9-110.)  The fact that

13  preservation of the swab was the policy does not endow the swab with exculpatory value as

14  suggested by Petitioner, and negligence does not amount to bad faith or a violation of due

15  process.  *See Youngblood*, 488 U.S. at 58 (finding negligence insufficient to demonstrate bad

16  faith); *Villafuerte v. Stewart*, 111 F.3d 616, 625-26 (9th Cir. 1997) (per curiam) (officers'

17  failure to test for fingerprints in certain areas and failure to perform tests on semen samples

18  did not demonstrate bad faith even if negligent).  In addition, as the court noted in *Villafuerte*,

19  the police do not have a "constitutional duty to perform all tests desired" by a suspect.  111

20  F.3d at 625 (citing *Youngblood*, 488 U.S. at 59).

21       The Arizona Supreme Court's denial of this claim was not an unreasonable

22  application of Supreme Court law.  Claim 3 is denied.

23       **VOIR DIRE – CLAIMS 4 & 5**

24       In Claim 4, Petitioner alleges that his right to a fair trial before an impartial jury and

25  his right to due process were violated by the trial court's failure to use Petitioner's proposed

26  questions for the jury questionnaire.  In Claim 5, Petitioner alleges that his right to a fair trial

27  before an impartial jury and his right to due process were violated by the trial court's failure

28  to ask most of the fourteen questions in his supplemental proposed voir dire.  In denying

these claims, the Arizona Supreme Court found that the trial court conducted extensive voir dire that sufficiently covered the questions Petitioner sought to have asked and, generally, that Petitioner failed to demonstrate that he was denied a fair and impartial jury. *Walden*, 183 Ariz. at 608, 905 P.2d at 987.

While there is no Supreme Court precedent specifically addressing juror questionnaires, clearly established Supreme Court law requires that a defendant be provided adequate voir dire such that unqualified jurors can be identified and the defendant can be tried by an impartial jury. *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Failure to ask specific questions in voir dire only violates the Constitution if it renders the trial fundamentally unfair. *Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991). The Constitution does not dictate the format voir dire must take or specific questions that must be asked; rather, the trial judge has great discretion in how voir dire is conducted. *See Morgan*, 504 U.S. at 729.

### Claim 4 – Juror Questionnaire

Although Claim 4 is phrased broadly in the Amended Petition to include the court's failure to ask any of Petitioner's proposed questions, his discussion of the claim is limited to one specific question. Petitioner asserts that when the trial court asked jurors, "Do you recall seeing or hearing anything about this case?" he requested that the question be extended to include, "or Mr. Walden." This inconsequential omission did not deprive Petitioner of a fair trial.

First, the juror questionnaire provided a summary of the factual basis for the charges against Petitioner, including his name and his employment. (Juror Questionnaire at 1.)[8] After asking if the juror had seen or heard anything about the case, the questionnaire provided room for the juror to write down what he or she recalled hearing. (*Id.*) Next, it asked if the juror had formed an opinion about Petitioner's guilt or innocence "based upon

---

[8] The juror questionnaires were provided to this Court in a separate labeled envelope as part of the record on appeal.

what you may have read or heard." (*Id.*)  These questions provided an adequate opportunity for jurors to indicate if they had heard or formed any opinions about Petitioner even if it not specifically connected to the case.  Second, the judge introduced Petitioner to the prospective jurors and asked if anyone knew him in any way.  (RT 7/9/92 at 52.)  Shortly thereafter, the judge explained that there had been publicity about the case and asked if the jurors could judge the case based on the evidence presented in court.  (*Id.* at 59.)  Later during voir dire, the judge again mentioned that Petitioner was presumed innocent and could only be convicted if the State produced sufficient evidence, regardless of any opinions a juror had about the case based on publicity.  (*Id.* at 110-11.)

Pre-trial publicity about Petitioner and knowledge of him or the case in general was adequately covered in voir dire.  The trial court's choice not to ask Petitioner's specific question did not render the trial fundamentally unfair.  The Arizona Supreme Court's denial of Claim 4 was not an objectively unreasonable application of Supreme Court law.

### **Claim 5 – Supplemental Voir Dire**

Petitioner challenges the trial court's failure to ask questions one through eight, ten, and twelve to fourteen from his supplemental proposed voir dire (ROA 144-46).

Question one asked:  "Have you or any member of your family or close friend ever been threatened with a knife?"  (ROA 145.)  This question was adequately covered by the questionnaire and voir dire.  The juror questionnaire, after summarizing the crimes, including the use of a knife in the assault of Blanar, asked:  "Have you had any personal or family experiences which might affect your ability to be fair and impartial, i.e. affect the way you would view the facts as presented to you in court?"  (Juror Questionnaire at 2.)  During voir dire, the court acknowledged that jurors could have an emotional reaction to some of the evidence, including sexual matters and a killing, and that they should inform the court if they could not be objective because of the nature of the case.  (RT 7/9/92 at 65.)

The court also followed up on the questionnaire by asking "if anybody on the panel or somebody that you care about, a family member, who's ever been the victim of either a sexual assault or another personal assault where some sort of weapon and a personal

confrontation were involved," as well as if "[a]nyone on the panel or a family member or someone you care about [had] ever been accused of having committed such an offense." (*Id.* at 81, 84.)  Contrary to Petitioner's contention that without asking his specific question a juror could have chosen not to divulge that he or she had been threatened with a knife (Dkt. 124 at 28), it is clear that such an experience falls squarely within the court's question asking if anyone had been assaulted with ANY weapon.  The court's questions were more than adequate to address potential juror bias based on related assault experiences.

Petitioner alleges that his proposed questions two, three, four, five, and ten were designed to raise all the ways in which a juror might have had contact with the geographic areas of the crimes:

> 2.  Do any of you travel frequently on any city bus routes?  If so, which routes?
>
> 3.  Do any of you now, or have you in the past, regularly traveled between Wilmot/Speedway or Alvernon/Ft. Lowell or between Campbell/Roger and Craycroft/29th?  If so, for what reason?
>
> 4.  Within the last five years, have any of you ever lived in the following apartment complexes:   1) Desert Sage; 2) the Palms; 3) El Jardin Privado?
>
> 5.  Do any of you have any friends or relatives who have lived in those apartment complexes in the last five years?
>
> . . . .
>
> 10.  Have any of you ever lived in an apartment complex managed by Clifton Properties?  If so, which one?

(ROA 145.)

The juror questionnaire used by the court identified the major cross streets for the two areas of town in which the crimes took place, Craycroft and 29th, and Alvernon and Ft. Lowell. (Juror Questionnaire at 1.) After providing that information, the questionnaire asked the jurors if they had seen or heard anything about the case, and if any personal or family experiences would affect their ability to be impartial. (*Id.* at 1-2.) During voir dire, the court reiterated the relevant areas of town in which the crimes took place, and asked if anyone lived in those areas or if they had visited other people in those areas.  (RT 7/9/92 at 87-88.)

1    With respect to the two jurors that answered in the affirmative, the judge asked follow-up

2    questions about their knowledge of the areas and any impact it would have on their

3    impartiality. (*Id.* at 88-90.)

4          These questions sufficiently covered Petitioner's concern regarding jurors'

5    connections to the areas of town where the crimes occurred.  Regarding question two, travel

6    by bus was not relevant to the facts of this case and the possibility of bias based on a juror

7    riding a bus route that passed near the crime scenes is remote.  The other intersections cited

8    in Petitioner's question three relate to locations at which the defense claimed Petitioner was

9    working during the commission of the crimes; Petitioner does not even contend that

10   connection to those areas would raise bias.  Questions four, five, and ten merely ask more

11   specific questions about a juror's connection to the area of the crimes; they were only

12   necessary to the extent someone answered affirmatively to the general questions.  A juror is

13   much more likely to recall a general area in which they or someone they knew lived rather

14   than the name of the management company or the apartment complex.

15         Question six asked:  "Have you ever seen any police department flyers requesting

16   information about criminal suspects?  Have they ever had photographs or drawings of the

17   suspects?  Have you ever provided information to the police concerning a suspect after

18   seeing such a flyer?  If so, what were the circumstances?" (ROA 145.)  Petitioner contends

19   that question six was necessary to determine if any jurors had been exposed to the flyer with

20   a composite drawing of Petitioner and had formed an opinion about that person's guilt, even

21   if they were not aware it was Petitioner.  As discussed with respect to Claim 4, the trial court

22   adequately covered the jurors' pretrial exposure to publicity about Petitioner and the case.

23         Petitioner asserts that questions seven and eight were necessary to assess how the

24   jurors felt and thought about co-worker relationships because his alibi defense was premised

25   on co-worker testimony:

26         7.    Within the last five years, have any of you been employed in a position
                 where one of your responsibilities is to double check the accuracy of
27               work done by co-workers?  What is your position?

28         8.    Within the last five years, have any of you been employed in a position

where the accuracy of your work was regularly checked by a co-worker?  What is your position?

(ROA 145.)  Failure to pose these questions did not affect Petitioner's right to a fair trial. First, the specific phrasing of the questions regarding juror experiences checking or having one's work checked for accuracy by co-workers has very little bearing on co-worker credibility, judging co-workers objectively, or an alibi defense.  Second, there is nothing unique about the relationship between co-workers, and its potential impact on witness credibility, such that the topic needs to be addressed separately during voir dire.

Petitioner contends that question twelve was critical to identify jurors who would refuse to acknowledge that eyewitness identification could be erroneous:  "Have any of you ever had someone come up to you and say you look like someone else?"  (*Id.*)  Again, this question does not effectively address the question Petitioner wished to raise – whether the potential jurors thought it was possible for eyewitness testimony to be mistaken.  This issue is covered by the general questions and jury instructions given by the court, including instructions on the presumption of innocence and the requirement that jurors evaluate each witness's credibility based on their testimony in court and the other evidence presented.

Question thirteen asked:  "Do any of you have any training, education or work experience in any of the following areas:  serology or comparison of blood types; comparison of hairs, fingerprint classification or comparison?"  (ROA 146.)  Petitioner contends that while the court inquired about juror experience in blood-related work and fingerprint comparison, the portion of question thirteen regarding experience in hair comparison was important because unidentified hair was critical to his case.  In addition to the inquiry about experience regarding fingerprint and blood comparisons (RT 7/9/92 at 79), the court inquired about anyone with law enforcement experience or connections (*id.* at 77).  The omission of a question specifically addressing the jurors' experience in hair analysis was not so critical to Petitioner's case that it rendered his trial fundamentally unfair.

Question fourteen asked:  "Do any of you believe that police might make mistakes on crimes that are not very serious, but that they would never make a mistake on a serious

1    crime?" (ROA 146.)  Petitioner asserts that question fourteen was critical to assess whether

2    any juror was biased in believing that law enforcement would never make a mistake related

3    to a serious crime.  The court asked the panel if they had connections to law enforcement and

4    how those relationships might impact their ability to be impartial (RT 7/9/92 at 77-78), and

5    inquired whether any jurors would give more or less weight to the testimony of law

6    enforcement witnesses or believed them to be "uniformly great and infallible" (*id.* at 113).

7    These questions were sufficient to probe any juror bias regarding law enforcement witnesses.

8         In sum, the voir dire as a whole was sufficient, and the court's decision not to ask the

9    specific questions at issue did not render Petitioner's trial fundamentally unfair.  The Arizona

10   Supreme Court's denial of Claim 5 was not an objectively unreasonable application of

11   Supreme Court law.

12                    **DEATH QUALIFICATION OF THE JURY – CLAIM 9**

13        Petitioner alleges that his right to a fair trial and an impartial jury was violated by the

14   trial court's death qualification of the jury.  Specifically, he contends that the death-

15   qualification process violated his rights because in Arizona at the time of his conviction the

16   judge, not the jury, determined a capital defendant's sentence and therefore there was no

17   justification for obtaining a death-qualified jury.  The Arizona Supreme Court denied this

18   claim as contrary to its precedent.  *Walden*, 183 Ariz. at 609, 905 P.2d at 988.

19        Clearly established federal law holds that the death-qualification process in a capital

20   case does not violate a defendant's right to a fair and impartial jury.  *See Lockhart v. McCree,*

21   476 U.S. 162, 178 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Adams v. Texas*,

22   448 U.S. 38, 45 (1980); *see also Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (death

23   qualification of Arizona jurors not inappropriate).  Petitioner has not cited – and the Court

24   has not located – any authority suggesting that this principle does not apply in cases where

25   the potential imposition of a death sentence is determined by the judge rather than a jury.

26        Petitioner suggests that his jury was not impartial because by discussing sentencing

27   the judge implied that he believed Petitioner would be found guilty, and that a jury that has

28   been death-qualified is more likely to convict than a jury that was not exposed to that

1   process.  To date, the Supreme Court has not agreed with that argument.  To the contrary, the

2   Supreme Court has held: "We simply cannot conclude, either on the basis of the record

3   before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital

4   punishment results in an unrepresentative jury on the issue of guilt or substantially increases

5   the risk of conviction."  *Witherspoon v. Illinois*, 391 U.S. 510, 518, 523 n.21 (1968) (stating

6   explicitly that its reversal of the death sentence did not affect the conviction).   In a

7   subsequent reversal of a death sentence, based on counsel not being allowed to ask jurors

8   whether they would automatically impose a sentence of death upon a finding of guilt, the

9   Court specifically noted that "[o]ur decision today has no bearing on the validity of

10  petitioner's conviction."  *Morgan v. Illinois*, 504 U.S. 719, 728 (1992) (citing *Witherspoon*,

11  391 U.S. at 523 n.21).  There is no per se rule that death-qualification of a guilt-phase jury

12  is a constitutional violation.

13          Because Petitioner's position is not supported by clearly established federal law, in

14  the form of United States Supreme Court precedent, the decision of the Arizona Supreme

15  Court denying the claim cannot form the basis for federal habeas relief.  *See Williams*, 529

16  U.S. at 365; *Musladin*, 127 S. Ct. at 653-54 (denying habeas relief in absence of clearly

17  established federal law).

18                   **ADMISSION OF PETITIONER'S STATEMENTS – CLAIM 10**

19          Alleging that his arrest was illegal and his waiver of his *Miranda* rights invalid,

20  Petitioner contends that his statements should have been suppressed based on the Fourth and

21  Fifth Amendments.

22          To the extent this claim is based on the Fourth Amendment it is not subject to review

23  by this Court.  In *Stone v. Powell*, 428 U.S. 465, 494 (1976), the Supreme Court held that

24  "where the State has provided an opportunity for full and fair litigation of a Fourth

25  Amendment claim, a state prisoner may not be granted federal habeas relief on the ground

26  that evidence obtained in an unconstitutional search and seizure was introduced at trial."

27  Pursuant to *Stone*, a prerequisite for consideration of Petitioner's Fourth Amendment claim

28  is the denial of the chance to fully and fairly litigate the claim in state court.  Petitioner does

1  not allege that he was denied such an opportunity, and the record indicates the trial court held

2  a hearing on the subject.  (RT 7/22/92 at 183-203; RT 7/23/92 at 3-20).  Moreover, when

3  Respondents raised a *Stone* defense in this Court, Petitioner did not respond in his reply brief.

4  Therefore, the Fourth Amendment portion of this claim is denied.[9]

5       Petitioner also alleges that his *Miranda* waiver was invalid because at the time of the

6  waiver he had not been informed that he was under arrest for murder as well as sexual

7  assault.  The statements Petitioner alleges should have been suppressed are ones in which he

8  stated that he had no explanation for his fingerprint being in the murder victim's apartment

9  and that he had never been there.  The Arizona Supreme Court denied this claim, finding that

10  Petitioner's waiver was not invalid simply because the officers did not inform him of each

11  crime for which he would be questioned.  *Walden*, 183 Ariz. at 610, 905 P.2d at 989.

12       In *Miranda*, the Supreme Court "concluded that in the context of 'custodial

13  interrogation' certain procedural safeguards are necessary to protect a defendant's Fifth and

14  Fourteenth Amendment privilege against compulsory self-incrimination."  *Rhode Island v.*

15  *Innis*, 446 U.S. 291, 297 (1980).  Specifically, a person under arrest, prior to being

16  questioned, must be warned that "he has a right to remain silent, that any statement he does

17  make may be used as evidence against him, and that he has the right to the presence of an

18  attorney, either retained or appointed."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  If

19  the person indicates at any time that he wishes to contact an attorney, there can be no further

20  questioning.  *Id.* at 445; *Edwards v. Arizona*, 451 U.S. 477, 484 (1981).  No one disputes that

21  Petitioner was in custody at the time he made the statements and that he had been given his

22  *Miranda* warnings.

23       Petitioner contends that his waiver was not knowing and intelligent under the

24  circumstances – i.e., that he did not know he was considered a murder suspect, was going to

25  ────────────

26       [9]  The record indicates that Petitioner voluntarily left his home and was placed under
    arrest outside, which is not a violation of the Fourth Amendment.  *See United States v.*
27  *Santana*, 427 U.S. 38, 42 (1976) (finding that the doorway of a home is a public place in
    which there is no expectation of privacy and a warrantless arrest based on probable cause in
28  such a location is constitutional).

1  be questioned about a murder, and was going to be arrested for murder.  In *Colorado v.*

2  *Spring*, 479 U.S. 564, 576 (1987), the Supreme Court addressed precisely this point and

3  found no *Miranda* violation, explaining that "[t]his Court has never held that mere silence

4  by law enforcement officials as to the subject matter of an interrogation is 'trickery'

5  sufficient to invalidate a suspect's waiver of *Miranda* rights, and we expressly decline to do

6  so today."  In *Spring*, a suspect was arrested on federal firearms violations, was informed of

7  and waived his *Miranda* rights, and during interrogation was also questioned about a murder.

8  *Id.* at 566-67.  Because there was no question that Spring understood his basic Fifth

9  Amendment privilege – the right not to speak, to have counsel present, to discontinue

10  speaking, and that anything he said may be used against him – his waiver was knowing and

11  voluntary.  *Id.* at 574-75.

12     Because Petitioner's rights under *Miranda* and the Fifth Amendment were not

13  violated, the admission of his statements was not unconstitutional.  Therefore, the Arizona

14  Supreme Court's denial of this claim was not an unreasonable application of federal law.

15           **GRUESOME PHOTOGRAPHS – CLAIM 11**

16     Petitioner alleges that the admission of nineteen photographs of the murder victim's

17  body at the crime scene and during the autopsy were unfairly prejudicial and rendered his

18  trial fundamentally unfair in violation of his right to a fair trial under the Sixth and

19  Fourteenth Amendments.  The trial court admitted the photos, finding that their relevance

20  outweighed any possible prejudice.  (RT 7/22/92 at 20-21, 24, 144-46.)  In denying this claim

21  on direct appeal, the Arizona Supreme Court found that the crime scene photos were properly

22  admitted to demonstrate the prosecution's theory of the sequence of events, cause of death,

23  and premeditation, and that the autopsy photos were helpful to illustrate the lengthy medical

24  testimony.  *Walden*, 183 Ariz. at 610-11, 905 P.2d at 989-90.

25     The admission of photographs is a state law matter that "lies largely within the

26  discretion of the trial court," *Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir. 1982), and only

27  if the admission of the evidence was so prejudicial as to offend due process may the federal

28  courts consider it on habeas review.  *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).

1    Admission of photographs that are relevant to elements of a crime charged does not violate

2    due process. *Id.* at 69-70; *Villafuerte v. Lewis*, 75 F.3d 1330, 1343 (9th Cir. 1996).

3        Petitioner contends that the photos were not relevant because he was willing to

4    stipulate as to the cause of death and the injuries to the victim and because the pathologist

5    gave a clear analysis of the victim's injuries. He also contends the photos were inflammatory

6    because they depicted the victim's lifeless body. Further, Petitioner argues the only issue in

7    dispute was the identity of the perpetrator of the crime, and the photos had no bearing on that

8    issue. The Court disagrees. Petitioner was not willing to stipulate that the murder was

9    premeditated, which remained a contested issue. The photos were relevant to that element

10   of the charge, and they were illustrative of the testimony provided by the medical examiner

11   regarding the victim's injuries.

12       As an initial matter, exhibits 114 and 115 were taken at the crime scene without the

13   victim's body in view.[10] Therefore, Petitioner's argument that the photographs were

14   inflammatory because they depicted the body fails as to these exhibits.[11] Exhibits 133, 134,

15   and 136-138 are autopsy photos. Taken after the body had been cleaned, the photos depict

16   minor scratches and bruises on limited portions of the victim's body. A reasonable person

17   could not consider these photos gruesome, and the Court does not address them further.

18       Of the remaining photos, three were taken at the crime scene and depict the body as

19   it was found. Exhibits 111 and 112 show the body face down, which is how it was

20   discovered, from two different angles to show most of the room. Exhibit 113 shows the body

21   turned up to reveal the front, including the electrical cord wrapped in the victim's hand.

22   These photos are relevant to the jury's understanding of the crime scene, including the

23   struggle that took place, and the element of premeditation. The photos are not close-up shots

24

_____

25       [10]  Copies of the photos admitted as trial exhibits, as well as those for which the

26   prosecution did not seek admission, were filed in this Court by the Respondents at the request
     of the Court. (*See* Dkt. 156.)

27

28       [11]  Respondents made this argument in their responsive brief (Dkt. 131 at 39 n.9), and
     Petitioner did not dispute the point (Dkt. 137 at 14-16).

of the body, nor do they depict any wounds, although a substantial amount of blood is visible. Further, a review of the other crime-scene photos that were not admitted reveal that the photos used by the prosecution were pared down to the least inflammatory images available.

The rest of the photos, exhibits 127-132, 135, 139, and 140, are autopsy photos of the victim's body and wounds.  The prosecution selected almost exclusively photos taken after the body had been washed (in contrast to much more gruesome bloody photos that were not admitted), and the court admitted only one to two photos of each wound.  These pictures were relevant to illustrate the doctor's testimony regarding the wounds (RT 7/22/92 at 4-72) and to establish premeditation for first degree murder.

The photographs admitted were relevant to the prosecution's theory of the case, to illustrate the doctor's testimony regarding the wounds and cause of death, and to support the element of premeditation.  The photographs were responsibly chosen among those available to minimize any inflammatory impact while conveying the necessary information.  Further, the jury was informed that the case involved sexual matters and a killing, and were given an opportunity to inform the court if the nature of the case would make them unable to weigh the evidence objectively.  (RT 7/9/92 at 65.)  Finally, there was substantial evidence of Petitioner's guilt, including Elaine Jordan's eyewitness testimony that Petitioner was at the apartment complex around the time of the crime and  Petitioner's fingerprint in the bedroom where the victim's body was found.  The Court finds that the admission of these photographs did not render Petitioner's trial fundamentally unfair in violation of his right to due process. The Arizona Supreme Court's denial of this claim was not an unreasonable application of Supreme Court law.  Claim 11 is denied.

### ADMISSION OF 911 TAPES – CLAIM 12

Petitioner alleges that the admission of two 911 calls (by Velasco and Jay Burhans) in their entirety, violated his right to a fair trial, confrontation, and cross-examination because they constituted inadmissable hearsay and were overly prejudicial.

Background

On direct examination, Kristina Velasco said that she saw a beeper on her assailant.

1  (RT 7/15/92 at 141.)  After the assault, Velasco ran from her apartment to the manager's
2  office where she told the person working, Grace Chastain, that she needed help.  (*Id.* at 148-
3  49.)  Chastain called the police.  (*Id.* at 149.)  During cross-examination, defense counsel
4  asked Velasco if she had mentioned the fact that her attacker had a beeper when she was
5  interviewed at the hospital the day of the assault.  (*Id.* at 178.)  Velasco stated that she had
6  mentioned the beeper during the 911 call, but did not know if she had talked about it in later
7  interviews with the police.  (*Id.* at 179-81.)  During redirect examination, Velasco testified
8  that she was present when Grace Chastain called the police, that she also spoke to the police
9  during the call, and that she had reviewed the recording and found it accurate.  (*Id.* at 186,
10  188.)  Petitioner's counsel objected to admission of the 911 call recording as outside the
11  scope of cross-examination and as hearsay because two other persons were on the tape.  (*Id.*
12  at 187-89.)  The court admitted the tape, it was played, and then Velasco was excused as a
13  witness.  (*Id.* at 189.)  On the same trial day, just prior to Velasco's testimony, Chastain
14  testified that she called 911 when Velasco came to the office, and that she and Velasco spoke
15  with the dispatcher.  (*Id.* at 111.)

16  During his direct examination, Jay Burhans testified that the evening before his wife
17  was murdered one of his coworkers and the coworker's wife came by their apartment for a
18  visit.  (RT 7/16/92 at 173.)  The following day, upon finding his wife's body in the
19  apartment, he called 911.  (*Id.* at 181.)  During cross-examination, defense counsel brought
20  out the fact that when interviewed by the police on the day of his wife's murder Burhans did
21  not mention, when asked about the events of the prior evening, that they had visitors.  (RT
22  7/17/92 at 11-14.)  On redirect, the prosecutor asked Burhans what his emotional state was
23  when he gave his initial statement to the police, as well as subsequent statements, and he
24  stated that he was shocked and in a state of grief.  (*Id.* at 19, 20.)  The prosecutor confirmed
25  with Burhans that he had guests over the night before his wife was murdered, although he
26  did not recall ever telling the police that detail.  (*Id.* at 19.)  After his testimony, the
27  prosecutor asked to admit the 911 tape to show Burhan's emotional state after he found his
28  wife dead, to demonstrate why he may not have remembered to tell the police everything.

1    (*Id.* at 20-21.)  Petitioner's counsel objected that it was unnecessary because Burhans had

2    testified to his emotional state.  (*Id.* at 21.)  The court delayed ruling on admission of the 911

3    call, with the defense stipulating to the foundation for admissibility.  (*Id.* at 22.)  At a later

4    date, the court admitted the 911 call and it was played to the jury.  (RT 7/23/92 at 94.)

5            The Arizona Supreme Court found that the Velasco 911 tape was within the scope of

6    cross-examination because Petitioner's counsel questioned Velasco's failure to mention that

7    her assailant was wearing a beeper when she was interviewed by the police.  *Walden*, 183

8    Ariz. at 611, 905 P.2d at 990.  The court concluded it was not hearsay because the tape was

9    offered to demonstrate that Velasco had reported seeing a beeper during the 911 call, not to

10   prove that her attacker was wearing a beeper.  *Id.*  Further, it was used to show her emotional

11   state, which might explain inconsistencies in her description.  *Id.*  Similarly, the court found

12   that the Burhans 911 tape was offered by the State to prove Burhans's emotional state to

13   counter defense counsel's cross-examination of him regarding his memory of that day.  *Id.*

14   The court further held that the Burhans tape was not hearsay and, alternatively, that it met

15   the excited utterance exception or exception for statements on the declarant's state of mind,

16   emotion, or sensation.  *Id.*

17        Analysis

18        *Confrontation Clause and Cross-examination*[12]

19            Petitioner alleges that his right to cross-examination was denied because the 911 tapes

20   were played after the witnesses on the tape testified.  Petitioner had a right under the

21   Confrontation Clause of the Sixth Amendment and the Due Process Clause to cross-examine

22

23        [12]  At the time the parties briefed this claim, the Ninth Circuit had ruled that the
24   holding in *Crawford v. Washington*, 541 U.S. 36 (2004), addressing the admissibility of out-
     of-court testimonial statements, was retroactive.  *See Bockting v. Bayer*, 399 F.3d 1010 (9th
25   Cir. 2005).  The parties' briefs are based on *Crawford*.  (Dkt. 124 at 60; Dkt.131 at 44 &
     n.10.)  The Supreme Court has since held that *Crawford* does not apply retroactively.  *See*
26   *Whorton v. Bockting*, 127 S. Ct. 1173 (2007).  Therefore, to resolve this claim, the Court
27   looks to the clearly established Supreme Court law at the time of the Arizona Supreme
     Court's 1995 decision on Petitioner's direct appeal.
28

the witnesses against him. *Davis v. Alaska*, 415 U.S. 308, 315 (1974); *Pointer v. Texas*, 380 U.S. 400, 403-04 (1965). Petitioner's claim fails, however, because Velasco, Chastain, and Burhans all testified at trial and were subject to cross-examination. If a witness is present and available for cross-examination, the admission of that witness's out-of-court statement does not violate the Confrontation Clause. *California v. Green*, 399 U.S. 149, 162 (1970).

The Ninth Circuit has explained that "when material new matters are brought out on redirect examination, the Confrontation Clause of the Sixth Amendment mandates that the opposing party be given the right of recross-examination on those new matters." *United States v. Jones*, 982 F.2d 380, 384 (9th Cir. 1993). This principle does not assist Petitioner.

First, Petitioner has not made a showing that material new matters were raised by the playing of the 911 tapes, nor has he suggested any critical issues that counsel would have addressed during recross-examination. In particular, Petitioner has not argued that he was denied an opportunity to impeach a witness's credibility or expose witness bias or motive to testify. *See Davis*, 415 U.S. at 316 (finding that impeachment of credibility and exposure of bias are important goals served by the right of cross-examination). The right to cross-examination is not impeded when the limitation restricts a subject matter that is "only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Second, if counsel believed additional examination was warranted in light of the admission of the 911 tapes, counsel could have requested the re-opening of cross-examination. Velasco was still present in the witness chair at the time her tape was played, and Burhans resided locally (RT 7/16/92 at 160) and had already been re-called to the stand once by the prosecution (RT 7/22/92 at 95). Because counsel did not seek, and was therefore not denied, the opportunity to re-cross these witnesses after the playing of the 911 tapes, there was no violation of the Confrontation Clause.

Petitioner's separate allegation that his rights were violated because the 911 operators did not testify has no merit and he cites no law in support of his assertion. Petitioner argues that cross-examination of the witnesses was "essential to test the reliability of the testimonial information conveyed in the tapes." (Dkt. 124 at 61.) Velasco testified to the accuracy of

1    the tape of her call, and Petitioner's counsel stipulated to the foundation for admission of

2    Burhans's tape.  Additional testimony regarding reliability was not necessary.

3        Additionally, nothing said by Velasco, Chastain, Burhans, or the 911 operators was

4    admitted to prove the truth of their statements.  Therefore, the information was not hearsay

5    and its admission did not violate the Confrontation Clause.[13]  *See Tennessee v. Street*, 471

6    U.S. 409, 414 (1985).

7        Finally, if there was a Confrontation Clause violation, the Court would next assess

8    "whether, assuming that the damaging potential of the cross-examination were fully realized,

9    a reviewing court might nonetheless say that the error was harmless beyond a reasonable

10    doubt." *Van Arsdall*, 475 U.S. at 684.  As discussed above, Petitioner has not indicated what

11    information he might have elicited if he had conducted cross-examination after the playing

12    of the 911 tapes; he merely asserts that he did not have the opportunity to question the

13    witnesses about "the contents of the recordings" (Dkt. 124 at 62).  Nothing in the record

14    reveals any inquiry regarding the 911 calls that would have had the potential to damage the

15    prosecution's case or bolster the defense.  Therefore, Petitioner has not made a showing that

16    such error, if any, was not harmless beyond a reasonable doubt.

17       *Due Process*

18        Petitioner alleges that admission of the 911 tapes served no evidentiary purpose and

19    that playing them inflamed the passion of the jury in favor of the victims, which was

20    prejudicial and patently unfair in violation of his right to due process.  As found by the

21    Arizona Supreme Court, both 911 calls were relevant to issues raised during cross-

22    examination.  During cross-examination of Velasco, defense counsel questioned when she

23    had reported that her attacker was wearing a beeper.  Velasco stated that she reported the

24    beeper during the 911 call; therefore, the 911 tape was within the scope of cross-examination.

25    Further, the call was admitted to establish that she had reported seeing a beeper, not that her

26

27        [13]  This conclusion is supported by the fact that Petitioner acknowledges but does not

28    attempt to refute Respondents' argument that the calls were not hearsay because they were
      not offered for the truth of the matter asserted.  (Dkt. 137 at 16-17.)

attacker in fact wore a beeper.  Similarly, during cross-examination of Burhans, defense counsel raised questions about what Burhans reported to police during his initial interview. The State offered the 911 call to demonstrate Burhans's emotional state at that time, which may have impacted his recollection of events.  Thus, the 911 calls were relevant evidence. Further, as discussed previously, the evidence of Petitioner's guilt was strong.  The admission of the 911 calls was not so prejudicial that it prevented Petitioner from having a fair trial.

The Arizona Supreme Court's denial of this claim was not an unreasonable application of Supreme Court law.  This claim is denied.

**MISIDENTIFICATION DEFENSE – CLAIM 13**

Petitioner alleges that the trial court's denial of his request to present evidence of two sexual assaults that occurred after he had been taken into custody, which he sought to use as evidence of an alternative assailant in support of his misidentification defense, violated his right to present a complete defense and his right to a fair trial.

The right to due process includes the right to present a defense and to defend against the State's charges. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  On habeas review, the question is whether the court's refusal to admit the evidence rendered Petitioner's trial fundamentally unfair.  *Id.* at 302-03.

The trial court ruled that the two incidents had no relevance to the issues in Petitioner's case.  (RT 7/28/92 at 214.)  The Arizona Supreme Court denied this claim, holding that the evidence was properly excluded.  *Walden*, 183 Ariz. at 611-12, 905 P.2d at 990-91.  The court explained that while the later incidents bore some similarities to the sexual assaults charged against Petitioner – one of the assaults occurred in an apartment complex laundry room, with the perpetrator carrying a knife, and both victims were attacked from behind – the descriptions provided by the victims rendered evidence concerning the subsequent attacks irrelevant.  One of the suspects was described as scraggly, wearing no shirt, and having hair below his shoulders.  *Id.* at 611, 905 P.2d at 990.  The other was a "skinny Hispanic" who "smelled like a garbage disposal or cantaloupe." *Id.* at 611-12, 905

1   P.2d at 990-91.  These descriptions did not resemble those offered by Blanar and Velasco,

2   the victims in Petitioner's case.  In fact, in the opening statement, Petitioner's counsel noted

3   that neither of the sexual assault victims described their attacker as Hispanic.  (RT 7/14/92

4   at 83, 92.)

5          The core of Petitioner's defense to the sexual assaults was alibi – that based on the

6   time-line of events he could not have committed the assaults because he was at work.  This

7   defense could be adequately presented without offering other suspects to the jury.  More

8   importantly, Petitioner had no evidence linking these other alleged suspects to the sexual

9   assaults on Velasco or Blanar.  Finally, there was significant evidence of Petitioner's guilt.

10  Therefore, the Court finds that the exclusion of this evidence did not render Petitioner's trial

11  fundamentally unfair.  Claim 13 is denied.

12          **LIMITATION ON CROSS-EXAMINATION – CLAIM 14**

13          Petitioner alleges he was denied his right to cross-examine victim Blanar.  Blanar

14  identified Petitioner in a photo lineup one night when she returned from the store after

15  purchasing beer.  The trial court prohibited Petitioner's counsel from asking Blanar why she

16  had gone to the store that night, indicating it would waste time and was not material.  (RT

17  7/15/92 at 3-4.)  The Arizona Supreme Court denied this claim, finding that Petitioner's

18  specific question was irrelevant because counsel was allowed to ask Blanar how much beer

19  she drank that night, when she had consumed it, and what effect it had on her.  *Walden*, 183

20  Ariz. at 612, 905 P.2d at 991.

21          As addressed in Claim 12, Petitioner had a right under the Confrontation Clause of

22  the Sixth Amendment and the Due Process Clause to cross-examine the witnesses against

23  him.  *Davis*, 415 U.S. at 315; *Pointer*, 380 U.S. at 403-04.  Impeachment of a witness's

24  credibility and exposure of witness bias and possible motive in testifying are two purposes

25  served by the constitutionally protected right of cross-examination.  *Davis*, 415 U.S. at 316.

26  However, a trial court has broad discretion in determining the scope and extent of cross-

27  examination.  *See Alford v. United States*, 282 U.S. 687, 694 (1931); *Chambers*, 410 U.S. at

28  295; *Carriger v. Lewis*, 971 F.2d 329, 332-33 (9th Cir. 1992).  A trial court may impose

1   reasonable limits on cross-examination to prevent "harassment, prejudice, confusion of the

2   issues . . . or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475

3   U.S. at 679.

4         Petitioner contends that eliciting Blanar's testimony that she had gone to the store to

5   purchase beer was critical to challenge the reliability of her identification as occurring in a

6   party-like atmosphere, and to allow the jury to assess her character and reliability.  As noted

7   by the Arizona Supreme Court, Petitioner was allowed to demonstrate that Blanar was

8   drinking that evening, how much she consumed, and how it affected her.  Additionally,

9   Petitioner's counsel established that the identification took place just before midnight, and

10  that Blanar was engaged in an ongoing game of dice with her roommates that began at five

11  or six that evening.  (RT 7/15/92 at 17-18, 19.)  The additional information counsel sought

12  to elicit – that Blanar had gone to the store to buy beer that she had not consumed at the time

13  of the identification – was cumulative and, at best, minimally relevant in light of the other

14  evidence bearing on her reliability and credibility that had already been established during

15  cross-examination.

16        The Arizona Supreme Court's denial of this claim was not an unreasonable

17  application of Supreme Court law.  Further, even if the restriction on cross-examination was

18  error, it did not have a substantial and injurious effect on the verdict.  *See Brecht v.*

19  *Abrahamson*, 507 U.S. 619, 629 (1993).  This claim is denied.

20              **MISTRIAL BASED ON JUROR PHONE CALL – CLAIM 16**

21        Petitioner alleges that his right to an impartial jury was violated by the trial court's

22  denial of a mistrial based on a potentially threatening phone call received by juror Pierce.

23  The day after the jury began deliberations, the court spoke to Pierce because the bailiff had

24  heard Pierce mention to another juror that he had gotten a phone call.  (RT 7/31/92 at 2, 4.)

25  When Pierce answered the phone, the caller said that they had seen him on jury duty in the

26  *Walden* case.  (*Id.* at 3.)  Pierce responded "oh yeah"; the caller said something else which

27  Pierce didn't hear, maybe "I'll talk to you later," and then hung up.  (*Id.* at 3, 5.)  Pierce said

28  he had received harassment calls in the past about other issues, but this call was nothing and

1    did not bother him.  (*Id.* at 5.)  He said he did not think the person who called was trying to

2    influence him and it would not interfere with his ability to be impartial.  (*Id.* at 4.)  He stated

3    that he did not share information about the call with the other jurors.  (*Id.*)

4    The trial court denied Petitioner's request for a mistrial, finding that the contact was

5    innocuous and Pierce was credible in his assurance to the court that the incident would not

6    influence his deliberations and he would not share the conversation with others.  (*Id.* at 10-

7    11.)  The Arizona Supreme Court denied the claim, finding that Petitioner had not established

8    any prejudice arising from the contact.  *Walden*, 183 Ariz. at 612, 905 P.2d at 991.

9    Petitioner defines this claim as one of jury tampering, in which prejudice is presumed

10    and the burden is placed on the government.  The Ninth Circuit defines jury tampering as "an

11    effort to influence the jury's verdict by threatening or offering inducements to one or more

12    of the jurors."  *United States v. Dutkel*, 192 F.3d 893, 895 (9th Cir. 1999).  Based on Pierce's

13    testimony, this claim is not properly classified as tampering – Pierce did not deem the call

14    threatening and no inducement was offered; the call was brief and ambiguous, and its origin

15    and purpose unknown.  Moreover, even if prejudice is presumed, as required for tampering

16    cases, *see Remmer v. United States*, 347 U.S. 227, 229 (1954), the presumption was rebutted.

17    The trial court's finding that the jury was not biased due to the phone call Pierce

18    received is entitled to a presumption of correctness.  *See Rushen v. Spain*, 464 U.S. 114, 120

19    (1983) (presuming correct a finding about the substance of and impact on a juror of an ex

20    parte communication); *Smith v. Phillips*, 455 U.S. 209, 210 (1982).  In order to overcome this

21    presumption, Petitioner must rebut it with clear and convincing evidence, which he has not

22    done.  *See* 28 U.S.C. § 2254(e)(1).  Petitioner argues that Pierce classified or associated the

23    call with harassing calls he had received in the past.  The Court disagrees.  The juror

24    distinguished the call as "nothing," in **contrast** to harassing calls he had received previously.

25    He compared it to conversations with his friends who would ask if he was still on jury duty

26    and, when he said yes, knew they could not discuss it.  (RT 7/31/92 at 5.)  Additionally,

27    Petitioner has not rebutted the trial court's fact finding that the juror had not shared the call

28    with other jurors.  *Cf. United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993) (requiring that

1    other jurors be questioned because the juror that received a threatening phone call informed

2    the judge that she had disclosed it to the other jurors).

3        Petitioner received the due process to which he was entitled, "a jury capable and

4    willing to decide the case solely on the evidence before it, and a trial judge ever watchful to

5    prevent prejudicial occurrences and to determine the effect of such occurrences when they

6    happen." *Phillips*, 455 U.S. at 217.  The Arizona Supreme Court's denial of this claim was

7    not an unreasonable application of Supreme Court law.

8                **JURY INSTRUCTIONS – CLAIMS 17 TO 22**

9        Petitioner alleges that his right to due process was violated by the jury instruction

10   defining reasonable doubt (Claim 17); the lack of a limiting instruction regarding evidence

11   of Petitioner speeding (Claim 18); the lack of an instruction regarding the limitation on the

12   eyewitness identification expert's testimony (Claim 19); the jury instruction regarding expert

13   testimony (Claim 20); the lack of an instruction regarding prior inconsistent statements

14   (Claim 21); and the felony murder jury instruction (Claim 22).

15        When a particular jury instruction is challenged, the question is whether the erroneous

16   instruction "so infected the entire trial that the resulting conviction violates due process."

17   *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  This Court must assess "'whether there is a

18   reasonable likelihood that the jury has applied the challenged instruction in a way' that

19   violates the Constitution."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Boyde v.

20   California*, 494 U.S. 370, 380 (1990)).

21                **Reasonable Doubt – Claim 17**

22        Petitioner argues that language in the reasonable doubt instruction relieved the

23   prosecution of the burden of proving each element of the crimes beyond a reasonable doubt.

24   The following instruction was given to the jury:

25            The law does not require a defendant to prove his innocence.  Every
              defendant is presumed by law to be innocent.  The state must prove the

26            defendant guilty beyond a reasonable doubt.  This means the State must prove
              each element of the charges beyond a reasonable doubt.  If you conclude that

27            the State has not met its burden of proof beyond a reasonable doubt, then doubt
              exists, and the defendant must be acquitted of that charge.

28

The term "reasonable doubt" means doubt based upon reason.  This does not mean an imaginary or possible doubt.  It is a doubt which may arise in your minds after careful and impartial consideration of all the evidence or from the lack of evidence.  Evidence which establishes a suspicion only, or the mere probability of guilt, is not enough to prove a person guilty beyond a reasonable doubt.

(ROA 230.)  The Arizona Supreme Court held that the instruction was adequate.  *Walden*, 183 Ariz. at 612, 905 P.2d at 991.

Petitioner alleges that the last sentence in the instruction – "a suspicion only, or the mere probability of guilt is not enough to prove a person guilty beyond a reasonable doubt" – allowed the jury to find Petitioner guilty based on a high probability or clear and convincing evidence of guilt, thus lowering the State's burden of proof in violation of his due process rights.

Due process requires that the state prove every necessary fact and element of a crime beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1970); *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979).  Beyond the general rule from *Winship*, the Supreme Court has had few occasions to address the issue of jury instructions related to reasonable doubt.  The parties point to *Cage v. Louisiana*, 498 U.S. 39, 40-41 (1990), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991), as the only case in which the Court has overturned a reasonable doubt instruction.  In *Cage*, the Court held that the instruction violated due process because it lowered the State's burden of proof by defining reasonable doubt as "such doubt as would give rise to a grave uncertainty," and "actual substantial doubt," and by stating that a "moral certainty" of guilt was required to convict.  *Id.* at 41.  In contrast, the Court long ago approved a jury instruction stating, "You are required to decide the question submitted to you upon the strong probabilities of the case, and the probabilities must be so strong as not to exclude all doubt or possibility of error, but as to exclude reasonable doubt."  *Dunbar v. United States*, 156 U.S. 185, 199 (1895); *Victor v. Nebraska*, 511 U.S. 1, 22 (1994) (holding *Dunbar* controlling on the same question).  These cases, which do not address the language at issue here, are not directly controlling.  Rather, they clarify the general standard to be applied by this Court – whether there is a reasonable

1   likelihood that the jury applied the instructions as a whole in such a manner that it lessened

2   the State's burden of proof.

3       The Court finds that no such likelihood existed.  First, the trial court made an effort

4   to define "reasonable doubt," and Petitioner takes no issue with that language.  Second, the

5   instruction includes three sentences emphasizing that the State has the burden to prove each

6   element of the charge and Petitioner's guilt beyond a reasonable doubt.  Third, the final

7   sentence as written is a true statement and on its face indicates that a probability of guilt is

8   not enough.  Contrary to Petitioner's suggestion, the use of the word "mere," when taken in

9   conjunction with the remainder of the instruction, did not make it reasonably likely that the

10  jury found a high probability of guilt to be sufficient.  In other words, there is not a

11  reasonable likelihood that the jury applied the instruction in an unconstitutional manner.

12  Thus, it was not objectively unreasonable for the Arizona Supreme Court to deny this claim.

13              **Limited Purpose Evidence – Claim 18**

14      Petitioner alleges that the trial court violated his right to a fair trial by refusing to give

15  the jury an instruction on the limited purpose for which it could consider testimony that a

16  citizen had complained of seeing Petitioner speeding in a company car on an unspecified

17  occasion.  Petitioner requested the following instruction:

18      Evidence was admitted during the course of the trial concerning a complaint
        which was made about the defendant driving too fast at some previous time.
19      You shall not consider this testimony as evidence that the defendant was, in
        fact, speeding.  Likewise, you shall not consider this evidence as any
20      indication that the defendant may have driven higher than the speed limit at
        any other time.

21

22  (ROA 265.)  The Arizona Supreme Court denied the claim, finding that the trial court did not

23  admit the evidence for a limited purpose because Petitioner did not object to it based on

24  hearsay or that it was inadmissable character evidence; that the requested instruction

25  amounted to an instruction that the evidence was not admissible for any purpose; and that any

26  error was harmless because there was not a reasonable probability the verdict would have

27  been different if the jury had received a different instruction.  *Walden*, 183 Ariz. at 613, 905

28  P.2d at 992.

1    As found by the Arizona Supreme Court, the evidence at issue was not admitted for

2    a limited purpose, so no instruction to that effect was warranted.  Additionally, in the course

3    of a twelve-day trial, testimony amounting to four transcript pages was admitted about

4    whether there had been one complaint that someone driving Petitioner's work truck had been

5    seen speeding, only two lines of which were an affirmative response that there had been such

6    a complaint.  (RT 7/21/92 at 196-200.)   In the scope of all of the evidence, this limited

7    testimony and the lack of a limiting instruction related thereto did not render Petitioner's trial

8    fundamentally unfair.  The Arizona Supreme Court's denial of this claim was not objectively

9    unreasonable.

10    **Eyewitness Identification Expert Witness Testimony Limitation – Claim 19**

11    Petitioner contends the court should have given an instruction explaining why his

12    eyewitness identification expert, Dr. Geoffrey Loftus, was not allowed to opine on the

13    accuracy of actual eyewitness identifications in this case or the percentage of accuracy for

14    eyewitness testimony in general.  According to Petitioner, the denial of such an instruction

15    violated his right to a fair trial.

16    Petitioner requested the following instruction: "Under Arizona law, an expert witness

17    who testifies concerning factors that effect the reliability of eyewitness identifications may

18    not testify on the likelihood that a particular witness is correct or incorrect in his or her

19    identification or that eyewitness identification in general has a certain percentage of

20    accuracy."   (ROA 262.)   In denying the claim the Arizona Supreme Court held that

21    "[i]nstructions on why evidence is excluded are neither required nor desirable." *Walden*, 183

22    Ariz. at 613, 905 P.2d at 992.

23    Petitioner does not dispute that such testimony was prohibited under Arizona law;

24    rather, he contends that the jury should have been informed of that restriction by way of

25    instruction.  Respondents contend there is no controlling Supreme Court law regarding

26    instructions on testimonial limitations; Petitioner did not file a reply regarding that argument

27    nor identify any law directly on point.  Thus, it appears there is no controlling Supreme Court

28    authority on this specific issue that would entitle Petitioner to relief.  *See Musladin*, 127 S.

1    Ct. at 654.  Moreover, Petitioner is not entitled to relief under general due process law.

2         As asserted by Petitioner, eyewitness identifications were an important part of the
3    State's case against Petitioner.  To that end, the court gave several instructions relevant to
4    the assessment of that evidence, informing jurors that they were the sole arbiter of the facts
5    and should consider all of the instructions (ROA 276); that they must evaluate the
6    believability of witnesses based on the witness's ability to observe, memory, motive, and
7    inconsistent statements, as well as the testimony of other witnesses (ROA 278); that they had
8    to find beyond a reasonable doubt that in-court identifications were based upon an
9    independent recollection not "suggestive circumstances in the courtroom or any previous
10   pretrial identification" (ROA 283); and that Petitioner had presented an alibi defense and if
11   jurors had a reasonable doubt about his presence at the crimes he had to be found not guilty
12   (ROA 286).

13        Nothing that happened in court indicated to the jurors that Dr. Loftus's testimony was
14   limited.  In fact, he discussed several issues directly related to the identifications at issue in
15   the case, including the impact of fear-created stress on identification; the impact the presence
16   of a weapon has on the memory of other details; the incorporation of after-the-fact
17   information into a memory; the possibility of bias in photographic lineups; the possibility of
18   recognizing a photo after reviewing a large series of photos because it looks like a prior
19   photo rather than the actual person; and the fact that there is not necessarily a correlation
20   between confidence in an identification and its accuracy.  (RT 7/24/92 at 167-69, 176-77,
21   185-87, 188-91, 193, 196-97.)  Thus, it is not clear, as Petitioner asserts, that the jurors would
22   have been aware of, let alone concerned about, the limitation on Dr. Loftus's testimony, or
23   that they would have applied a negative inference against Petitioner due to such limitation.
24   The court was not required to draw attention to the limitation, and the jury instructions as a
25   whole provided sufficient information for the jury to assess the testimony and the eyewitness
26   identifications.

27        Therefore, the failure to give Petitioner's requested instruction did not render the trial
28   so fundamentally unfair that it violated due process.  *See Cupp*, 414 U.S. at 147.  The

Arizona Supreme Court's denial of this claim was not objectively unreasonable.

**Expert Witnesses – Claim 20**

Petitioner alleges that the expert witness instruction required a juror to find an expert's testimony unreasonable before the juror could disregard it, which misstated the law and deprived him of a fair trial.  The relevant instruction informed the jury:

> You must decide the believability of witnesses.  In doing so, take into account such things as their ability and opportunity to observe, their memory and manner while testifying, any motive or prejudice they might have, and any inconsistent statements.  Consider each witness' testimony in light of all the other evidence in the case.

> . . . .

> A qualified expert may give his opinion on questions in issue at trial.  To assist you in deciding such questions, you may consider the opinion and the reasons stated therefor by the expert who gave the opinion.  You are not bound to accept the opinion of the expert as conclusive.  You should give it the weight to which you find it to be entitled.  You may disregard any such opinion which you find to be unreasonable.

(ROA 278.)  The Arizona Supreme Court denied this claim, finding that the instructions as a whole negate the inference Petitioner gives to the final sentence.  *Walden*, 183 Ariz. at 614, 905 P.2d at 993.

Petitioner's interpretation of the language is based on reading the final sentence in isolation.  Taken as a whole, the other portions of the instruction make clear that the jurors could choose whether to consider an expert's testimony for any reason; the jurors were informed that they were to decide the believability of the witnesses, that they "may" consider an expert's opinion and the basis for the opinion, that they do not have to find the opinion conclusive, and that they decide what weight to give an expert opinion.  A review of the entirety of the instruction demonstrates that there is not a reasonable likelihood that the jury felt obligated to give weight to expert testimony unless they determined it was unreasonable.  The Arizona Supreme Court's denial of this claim was not an unreasonable application of federal law.

**Prior Inconsistent Statements – Claim 21**

Petitioner alleges that the trial court should have given an instruction regarding the

1   purposes for which the jury could use a witness's prior inconsistent statements.  He contends

2   that the instruction was required based on prior inconsistent statements by two experts called

3   by the State, Allen Hatch and Steven Clemmons.

4          On direct examination, Hatch explained that, with respect to finding blood group

5   markers in other bodily fluids, everyone is a secretor on a range from very high to very low,

6   and testers group them into secretors and non-secretors; non-secretors can be high or low as

7   well.  (RT 7/23/92 at 187, 189.)  He further testified that the markers of non-secretors

8   generally do not appear when less-sensitive testing methods are used but they might be found

9   when a more sensitive test is used.  (*Id.* at 188-89.)  On cross-examination, defense counsel

10  elicited the fact that in a pre-trial interview Hatch had stated that if a person was a non-

11  secretor their "blood group substances will not be present in other bodily secretions."  (RT

12  7/24/92 at 86.)  On re-direct, Hatch explained that it was an oversimplification to say that

13  non-secretors do not secrete their blood group substances at all, as he had previously

14  indicated on direct.  (*Id.* at 91-92.)  Similarly, with respect to Clemmons, defense counsel

15  asked on cross-examination, "And would it be accurate to say a [non-] secretor is someone

16  you do not detect the blood group substances at all?"  (RT 7/24/92 at 138.)  Clemmons

17  answered, "Depends what technique we are talking about in terms of trying to determine

18  whether they are secretor or nonsecretor."  (*Id.* at 139.)  Defense counsel then referred

19  Clemmons to his testimony in a prior case in which he stated, "nonsecretor you do not detect

20  blood group substances at all."  (*Id.* at 140.)

21         Petitioner requested the following jury instruction:  "If you find that a witness has

22  made a statement which is inconsistent with their testimony in court, you may consider that

23  inconsistent statement not only in determining the witness' credibility, but also for

24  substantive purposes."  (ROA 261.)  The Arizona Supreme Court denied the claim, finding

25  that there was no reason the jury would limit the use of the statements absent the requested

26  instruction, and that such an instruction might have the effect of emphasizing particular

27  testimony.  *Walden*, 183 Ariz. at 614, 905 P.2d at 993.  This Court agrees that the instruction

28  was not required.

First, the only reference to prior inconsistent statements in the instructions was found in the instruction stating that in assessing a witness's credibility the jurors should assess numerous factors, including any prior inconsistent statements. (ROA 278.) The jurors also were instructed that they were the sole fact finders and that they were to determine the facts based on the evidence presented in court, consisting of exhibits and testimony of witnesses. (ROA 276-77.) In contrast to the case on which Petitioner relies (Dkt. 124 at 89, citing *Gower v. Cohn*, 643 F.2d 1146, 1153 n.11 (5th Cir. 1981)), no instruction from Petitioner's case indicated that inconsistent statements could be used only for impeachment, not substantively, and there is no reason to believe a juror would impose such a limitation. Second, the statements cited by Petitioner are only nominally inconsistent; the discrepancy is a matter of semantics. In light of all the testimony at trial, this "inconsistency" was not critical.

For these reasons, the failure to give the requested instruction did not render Petitioner's trial fundamentally unfair, and the Arizona Supreme Court's denial of this claim was not objectively unreasonable.

### Felony Murder – Claim 22

Petitioner alleges that the felony murder jury instruction, specifically, the last sentence, eliminated the State's burden of proving the "in furtherance" element of felony murder. The jury was given the following instruction on the elements of felony murder:

[F]elony murder, requires proof of the following two things:

1.    The defendant committed or attempted to commit one of the following offenses:
      Sexual Assault; or
      Kidnapping; or
      Burglary; and

2.    In the course of and furtherance of any of those crimes, or in the immediate flight therefrom, the defendant or another person caused the death of any person. The homicide need not have been committed to perpetrate the felony.

(ROA 294.) The Arizona Supreme Court denied this claim, finding that "in the furtherance"

1   or "immediate flight therefrom" are broader than perpetration. *Walden*, 183 Ariz. at 614, 905

2   P.2d at 993.   The court also held that Petitioner's defense was based on alibi and

3   misidentification, and not on whether there was a causal connection between the felony and

4   the murder, and that there was no doubt the victim was killed in the course of the predicate

5   felony. *Id.*

6       As discussed in Claim 18, the State has the burden of proving each element of a crime

7   beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.   Thus, the jury instructions must

8   require a finding on each element of a crime; when an instruction relieves the state of the

9   burden of proving each element of a crime it runs afoul of the Constitution. *See Sandstrom*,

10   442 U.S. at 521.

11       The question is whether because of the final sentence of the instruction ("The

12   homicide need not have been committed to perpetrate the felony") there is a reasonable

13   likelihood the jury did not require the State to prove that the death of the victim was caused

14   "in the course of and in furtherance of" the predicate felony or in "immediate flight

15   therefrom." The Court determines that the answer to the question is no.   The final sentence

16   on its face is an accurate reflection of the law – the commission of the homicide does not

17   have to be necessary to the commission of the felony.   The murder can have occurred in

18   furtherance of the felony, or in the flight therefrom, without being essential to the

19   perpetration of the felony.   The final sentence does not negate that element of the crime.

20   There is not a reasonable likelihood the jury applied this instruction in a manner that relieved

21   the State of its burden to prove each element of felony murder.   The Arizona Supreme

22   Court's denial of this claim was not an unreasonable application of Supreme Court law.

23       ### (F)(1) & (F)(2) AGGRAVATING FACTORS – CLAIM 24

24       Petitioner alleges that the (F)(1) aggravating factor (defendant has been convicted of

25   another offense for which a sentence of life in prison or death was imposable) and the (F)(2)

26   aggravating factor (defendant has been previously convicted of a felony involving the use

27   or threat of violence) were unconstitutionally applied because the court used convictions

28   from the same case entered simultaneously with sentencing. Petitioner argues that to qualify

1    as a prior offense under (F)(1) and (F)(2), judgment on the conviction must have been

2    entered prior to the sentencing proceeding in which that conviction is used as an aggravator.

3            On July 31, 1992, the jury found Petitioner guilty of fourteen counts: (1) kidnapping,

4    of a dangerous nature; (2) aggravated assault, of a dangerous nature; (3) sexual abuse;

5    (4) sexual assault; (5) burglary; (6) kidnapping; (7) sexual abuse; (8 & 9) sexual assault;

6    (10) robbery; (11) burglary, of a dangerous nature; (12) kidnapping, of a dangerous nature;

7    (13) sexual assault; (14) first degree murder. (ROA 300-13.) Counts 1 through 4 relate to

8    victim Vicki Blanar; Counts 5 through 10 to victim Kristina Velasco; and Counts 11 through

9    14 to victim Miguela Burhans. (*Id.*) The court entered judgment on all the counts on

10   October 1, 1992. (RT 10/1/92 at 32-41.) Sentencing took place on December 9, 1992.

11   Although the form sentencing documents state that judgment **and** sentence were entered

12   December 9 (ROA 451), just prior to sentencing Petitioner, the court stated, "I believe the

13   record shows that the entry of judgment has already taken place." (RT 12/9/92 at 63). The

14   court found the (F)(1) aggravating factor satisfied by Counts 1 and 2. (RT 12/9/92 at 69-70,

15   77.) The court found the (F)(2) aggravating factor satisfied by Counts 1, 2, 4, 6, 8, and 9, and

16   by a May 2, 1990 conviction for aggravated assault.[14] (*Id.* at 70-72.)

17           The parties agree that the (F)(1) and (F)(2) factors can be based on any convictions

18   **entered** prior to the capital sentencing proceeding. The question is whether an Arizona

19   conviction is entered at the time there is a finding of guilt or at the time of sentencing when

20   a court technically enters judgment. The Arizona Supreme Court denied this claim, holding

21   that a conviction is entered at the time there is a determination of guilt. *Walden*, 183 Ariz.

22   at 615-16 & n.8, 905 P.2d at 994-95 & n.8.

23           As a preliminary matter, Petitioner is arguing that the simultaneous convictions cannot

24   be used for aggravation because judgment was entered the same day as the sentencing in

25   _____

26           [14]  On appeal, the Arizona Supreme Court found that the 1990 conviction did not
     satisfy the (F)(2) factor. *Walden*, 183 Ariz. at 617, 905 P.2d at 996. In the Amended
27   Petition, Petitioner argues that the 1990 conviction was not proven to be a crime of violence
     (Dkt. 21 at 44); because the Arizona Supreme Court agreed with this argument and found
28   that the prior assault did not satisfy (F)(2), this Court need not address that argument.

1  which the convictions were used as priors.  This argument is factually erroneous, as the court

2  initially entered judgment as to all counts on October 1, 1992 (RT 10/1/92 at 32-33; ROA

3  373), and Petitioner was not sentenced until December 9, 1992.

4      More significantly, the crux of Petitioner's argument is a disagreement with how the

5  Arizona Supreme Court has interpreted the (F)(1) and (F)(2) factors' statutory language.  If

6  a state court has defined a statutory factor, the federal court's role is limited to determining

7  "whether those definitions are constitutionally sufficient, i.e., whether they provide some

8  guidance to the sentencer." *Walton v. Arizona*, 497 U.S. 639, 654 (1990), *overruled on other*

9  *grounds by Ring v. Arizona*, 536 U.S. 584 (2002).  The state supreme court's interpretation

10 in this instance provides clear guidance, is not vague, and does not allow for arbitrary

11 imposition of the factors.  *See id.* at 655 (concluding that if a state court interpretation of the

12 aggravating factor furnishes sufficient guidance it satisfies the requirement that the death

13 sentence not be wantonly and freakishly imposed).  The definition establishes a bright line

14 test – a conviction is entered as of the determination of guilt and, if that occurs before a

15 capital sentencing, the conviction can be used to establish the (F)(1) or (F)(2) aggravating

16 factors.    This   satisfies   the   constitutional   requirements   applicable   to   aggravating

17 circumstances.  *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (aggravating factors

18 must   apply   only   to   a   subclass   of   defendants   convicted   of   murder   and   may   not   be

19 unconstitutionally vague).

20      The state court's interpretation does not undermine the rationale for the aggravating

21 factors. Contrary to Petitioner's contention that these factors are comparable in purpose with

22 habitual offender statutes that seek to give offenders a chance to rehabilitate, the Arizona

23 Supreme Court explained that:

24      Our death penalty statute is not a recidivist or enhancement statute used to
        warn  convicted  criminals  or  encourage  reform.    The  purpose  of  the
25      aggravation/mitigation hearing is to determine the character and propensities
        of the defendant.  That a defendant has been found guilty of another offense
26      for which life is imposable is directly relevant to this determination, whether
        judgement has entered or not.
27
   *Walden*, 183 Ariz. at 615-16, 905 P.2d at 994-95 (citations omitted).  Considering a person's
28

entire criminal history up to the point of sentencing is a principled means to distinguish those that receive the death penalty.  *Cf. Maynard v. Cartwright*, 486 U.S. 356, 362 (1988). Additionally, the Arizona Supreme Court's interpretation of when a conviction is entered is in accord with the common understanding of the term.  *See State v. Green*, 174 Ariz. 586, 587, 852 P.2d 401, 402 (1993) (conviction in its popular sense means the defendant has been found guilty).

For all of the reasons discussed above, Petitioner is not entitled to relief on Claim 24.

**(F)(6) AGGRAVATING FACTOR – CLAIMS 25 TO 28**

The trial court found both prongs of the (F)(6) aggravating factor – the crime was especially cruel and heinous/depraved.  The cruelty finding was based on the court's determination that the victim suffered both physically and mentally.  (RT 12/9/92 at 73-74.) The heinous/depraved prong was based on the court's findings that the crime was senseless, the victim was helpless, the motive was to eliminate the victim as a witness, and Petitioner inflicted gratuitous violence on the victim.  (*Id.* at 72-73.)

The Arizona Supreme Court upheld both prongs of the (F)(6) factor.  With respect to cruelty, the court found beyond a reasonable doubt that the victim was conscious for a period of time after the infliction of significant injuries.  This finding was based on the pathologist's testimony, the evidence of a struggle (the victim's hand was intertwined in the cord wrapped around her neck and blood was spattered around the room), the numerous blunt force injuries to different parts of the victim's body, and blood spatter indicating that the victim's carotid artery was severed at a place in the room different from where her body was found.  *Walden*, 183 Ariz. at 618, 905 P.2d at 997.  The court found that the heinous/depraved prong was established based on helplessness, senselessness, and gratuitous violence.[15]  *Id.* at 619, 905 P.2d at 998.  The court found that the victim was helpless in that she was "rendered powerless to resist the infliction of the fatal injuries," despite putting up a significant

---

[15]  Based on caselaw subsequent to Petitioner's sentencing, the Arizona Supreme Court found that witness elimination was not a proper basis for the heinous/depraved finding. *Walden*, 183 Ariz. at 619, 905 P.2d at 998.

1    struggle.  *Id.*  The crime was senseless because Petitioner's goal was to rape the victim,

2    which could have been accomplished without also killing her.  *Id.*  Finally, the court agreed

3    there was gratuitous violence, meaning violence beyond what was necessary to kill the

4    victim, as shown by the bruises on her arms and legs, her head wound, evidence of

5    strangulation, the two deep cuts to her throat, and the scraping/cutting injuries to her neck,

6    chest, and breast.  *Id.*

7                    **Facial Challenge to (F)(6) Factor – Claim 27**

8            In Claim 27, Petitioner alleges the (F)(6) aggravating factor is unconstitutionally

9    broad and can be applied to every first degree murder.  The Arizona Supreme Court

10   summarily denied this claim based on precedent.  *Walden*, 183 Ariz. at 619, 905 P.2d at 998.

11          As noted by Petitioner (who relies on a dissenting opinion), the United States Supreme

12   Court has upheld Arizona's (F)(6) aggravating factor against allegations that it is vague and

13   overbroad, rejecting a claim that Arizona has not construed it in a "constitutionally narrow

14   manner."  *See Lewis v. Jeffers*, 497 U.S. 764, 774-77 (1990); *Walton*, 497 U.S. at 649-56.

15   Petitioner's reply brief contends that *Walton* relied on the fact that death sentences were

16   imposed by judges, who are presumed to know the law, and that rationale is not applicable

17   today because sentences now are imposed by juries.  (Dkt. 137 at 29.)  This argument is

18   irrelevant because Petitioner's sentence was decided by a judge under the law analyzed in

19   *Walton* and *Jeffers*.  The Arizona Supreme Court's denial of this claim was not an

20   unreasonable application of Supreme Court law.

21                    **Cruelty – Claim 25**

22          Petitioner alleges there was insufficient evidence to support the trial court's finding

23   that the murder was especially cruel.  On habeas review of a state court's finding of an

24   aggravating factor, a federal court is limited to determining "whether the state court's

25   [application of state law] was so arbitrary and capricious as to constitute an independent due

26   process or Eighth Amendment violation."  *Jeffers*, 497 U.S. at 780.  In making that

27   determination, the reviewing court must inquire "'whether, after viewing the evidence in the

28   light most favorable to the prosecution, *any* rational trier of fact could have found that the

1  factor had been satisfied.'"  *Id.* at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319
2  (1979)).

3         Petitioner contends that the pathological evidence could be interpreted to support an
4  inference that the victim was not conscious for any period of time before she was killed.
5  This argument fails on its face to meet the *Jeffers* standard because it acknowledges that a
6  rational factfinder, viewing the evidence in the light most favorable to the State, could also
7  have inferred, as the state courts did, that the victim was conscious and suffering for a period
8  time.  Further, although the pathologist testified that he could not make any conclusive
9  findings about the order of the injuries, he stated that the strangulation and/or cuts to the neck
10 suffered by the victim were not instantaneously fatal and she would likely have survived for
11 several minutes.  (RT 7/22/92 at 69.)  Additionally, as noted by the Arizona Supreme Court,
12 the extent of the victim's injuries, the fact that blood was found in various parts of the room,
13 and the fact that the victim's hand was wrapped in the cord that was around her neck all
14 reveal that a significant struggle took place before the victim was rendered unconscious.
15 This evidence is sufficient for a rational trier of fact to find that the victim was conscious for
16 a sufficient period of time to have suffered.  Petitioner is not entitled to relief on this claim.

17         **Heinous/Depraved – Claim 26**

18        Petitioner alleges there was insufficient evidence to support the trial court's finding
19 that the murder was especially heinous or depraved.  As defined by the Arizona Supreme
20 Court, gratuitous violence is violence beyond what is necessary to kill the victim.  *Walden*,
21 183 Ariz. at 619, 905 P.2d at 998.  A rational trier of fact could have found gratuitous
22 violence based on the numerous injuries to the victim beyond the serious cuts to the throat
23 and the evidence of strangulation, including a head wound, cutting and scraping injuries to
24 her upper body, and bruises on her arms and legs.  There is sufficient evidence from which
25 a rational trier of fact could find that the victim, who was much smaller than Petitioner, was
26 helpless to resist the attack.  The senselessness finding is based on the court's determination
27 that killing the victim was unnecessary for Petitioner to achieve his goal of sexually
28 assaulting her.  As with his cruelty argument, Petitioner contends that it is equally plausible

to infer that Petitioner's objective was to kill the victim.  Again, that contention does not undermine the conclusion that a rational trier of fact could have found that Petitioner's goal was to sexually assault the victim, making the murder senseless.  In sum, a reasonable sentencer could have determined that Petitioner's offense was heinous and depraved based upon the gratuitous violence, its senselessness, and the helplessness of the victim.  Therefore, Petitioner is not entitled to relief on this claim.

### Remand – Claim 28

In Claim 28, Petitioner alleges that if the Court strikes down either one or both prongs of the (F)(6) aggravating factor, his case must be remanded for resentencing.  Even if Petitioner had rebutted one prong of the factor, Arizona law indicates that the finding of either especial cruelty or especial depravity alone will establish the (F)(6) factor and that the validity, or lack thereof, of the other prong does not affect the weight given to the circumstance.  *See, e.g., State v. Djerf*, 191 Ariz. 583, 597, 959 P.2d 1274, 1288 (1998) ((F)(6) circumstance upheld based on cruelty alone without considering validity of depravity finding); *State v. Towery*, 186 Ariz. 168, 188, 920 P.2d 290, 310 (1996) (same); *State v. Roscoe*, 184 Ariz. 484, 500-01, 910 P.2d 635, 651-52 (1996) (upholding (F)(6) factor based on cruelty after invalidating depravity finding); *State v. Bolton*, 182 Ariz. 290, 312, 896 P.2d 830, 852 (1995) ((F)(6) factor upheld based on cruelty alone without considering depravity finding).  Because the Court has not invalidated either prong of the (F)(6) factor and either one of them would be sufficient to uphold the factor, Claim 28 fails.

### ENMUND/TISON FINDING – CLAIM 30

Petitioner argues that the trial court failed to satisfy the requirements of *Enmund* and *Tison*; specifically, that because the jury found Petitioner guilty of felony murder, not premeditated murder, it was inconsistent for the judge find that he killed the victim.

By way of special verdict, all twelve jurors found Petitioner guilty of felony murder, and nine of the jurors also found him guilty of premeditated murder.  (ROA 313.)  At sentencing, the judge stated that Petitioner "brought about the death of Miguela Burhans, that he is solely and directly responsible for her death by inflicting the wounds that caused death,

1   and that in doing so he acted with conscious disregard and indifference to the value and

2   sanctity of human life." (RT 12/9/92 at 69.) On appeal, the Arizona Supreme Court denied

3   Petitioner's claim, finding that the *Enmund/Tison* finding was sufficient and supported by

4   the evidence. *Walden*, 183 Ariz. at 622, 905 P.2d at 1001.

5       Supreme Court precedent holds that a felony-murder defendant can be sentenced to

6   death only if he actually killed, attempted to kill, or intended to kill, or if the defendant was

7   a major participant in the underlying felony and acted with reckless indifference to human

8   life. *Tison v. Arizona*, 481 U.S. 137, 157-58 (1987); *Enmund v. Florida*, 458 U.S. 782, 797

9   (1982). As stated by the Arizona Supreme Court, the verdict indicated only that the jury was

10  not unanimous on the issue of premeditation, which does not mean the jury did not believe

11  that Petitioner was responsible for and intended the murder. Petitioner's argument – that a

12  person convicted of felony murder cannot be found to have actually killed – is in direct

13  contravention of the governing case law. The point of *Enmund* and *Tison* is to address the

14  applicability of the death penalty to defendants guilty of felony murder. *See Tison*, 481 U.S.

15  at 150 (noting that *Enmund* squarely held that **felony murderers** that kill or intend to kill can

16  be subjected to a death sentence). Additionally, to the extent Petitioner contends that only

17  a jury can make the requisite mental state finding, the Supreme Court has held that findings

18  pursuant to *Enmund* may be made by the trial or appellate court. *Cabana v. Bullock*, 474

19  U.S. 376, 387 (1986), *overruled on other grounds by Pope v. Illinois*, 481 U.S. 497 (1987).

20      Claim 30 is without merit and is denied.

21      **FAILURE TO CONSIDER ALL MITIGATION – CLAIM 31**

22      Petitioner argues that the trial court failed to consider all the mitigating evidence he

23  presented, in particular, evidence presented for the first time the day of the sentencing

24  proceeding, December 9, 1992. According to Petitioner, the court's actions demonstrate that

25  it was predisposed to sentence Petitioner to death regardless of the mitigation. In upholding

26  Petitioner's sentence, the Arizona Supreme Court held that "[n]othing in the record suggests

27  that the trial court failed to consider th[e] evidence." *Walden*, 183 Ariz. at 620, 905 P.2d at

28  999.

1    The clearly established Supreme Court law regarding consideration of mitigation is
2    set forth in *Lockett v. Ohio* and *Eddings v. Oklahoma*, which hold that "the Eighth and
3    Fourteenth Amendments require that the sentencer . . . not be precluded from considering,
4    *as a mitigating factor,* any aspect of a defendant's character or record and any of the
5    circumstances of the offense that the defendant proffers as a basis for a sentence less than
6    death." *Eddings*, 455 U.S. 104, 110 (1982) (quoting *Lockett*, 438 U.S. 586, 604 (1978)). The
7    Constitution and clearly established law require only that the sentencing court hear and
8    consider all mitigation evidence, but the court may determine the *weight* to accord such
9    evidence. *Id.* at 114-15. In assessing Petitioner's claim for habeas relief, the Court's role is
10   not to evaluate the substance of every piece of evidence submitted as mitigation. *See Jeffers*
11   *v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (holding that when it is evident that all mitigating
12   evidence was considered, trial court is not required to discuss each piece of such evidence).
13   Rather, the Court assesses whether the Arizona Supreme Court's conclusion – that the trial
14   court considered all proffered mitigation evidence – was contrary to or an unreasonable
15   application of the principles set forth in *Lockett* and *Eddings*.

16   Petitioner contends that letters marked as exhibits R through W, which were admitted
17   into evidence on the day of sentencing, may not have been considered by the court.
18   However, the transcript indicates that these exhibits were submitted to the court clerk on
19   November 20, and the judge already was in possession of all the documents from that
20   hearing. (RT 12/9/92 at 3-4.) The admission of the evidence on December 9 was a mere
21   technicality to complete the record. (*See id.*) Also, the judge stated prior to sentencing that
22   he had read the letter from Petitioner and "the many other letters that are pleaded here." (*Id.*
23   at 15.) Thus, the record indicates the court possessed, reviewed, and considered these
24   exhibits.

25   Next, Petitioner asserts that the court did not consider a supplemental notice of
26   mitigation filed the day of sentencing, which consisted of criminal records for Petitioner's
27   father, documenting sexual crimes involving minors and public indecency. (ROA 412-431.)
28   Petitioner raises several bases for his argument that the court did not consider this

information.  First, because the information was filed that day and the court already had prepared a written special verdict, Petitioner contends that it could not have been considered. The supplemental mitigation regarding Petitioner's father was only eighteen pages long and was the only mitigating evidence the court had not had in its possession for more than two weeks.  In contrast, the court had accepted written materials and conducted two prior days of aggravation/mitigation hearing. (RT 10/1/92; RT 11/20/92.)  Additionally, the judge took two breaks in the proceeding after receiving the supplement and prior to pronouncing sentence, during which he could have taken the information into account in the special verdict. (RT 12/9/92 at 14, 60.)  Finally, prior to reading his special verdict, the judge stated, "the Court has been guided by the written as well as the oral arguments of counsel and has prepared the special verdict."[16]  (*Id.* at 68.)  The surrounding circumstances do not contradict the court's statement that it had considered everything presented.

Second, Petitioner relies on a statement by the judge in response to arguments by counsel regarding whether the materials about Petitioner's father should be sealed.  The court stated, "From what I have seen it is – got little to do with the real issues in the case and more just a matter of what this all looks like on the record."  (*Id.* at 12.)  The Court disagrees that this statement indicates that the judge dismissed the evidence as not mitigating and did not consider it.  The more likely interpretation is that the judge was commenting on the issue of sealing the documents – in other words, the court was indicating that the matter of sealing the records is merely procedural and not a substantive matter.  Additionally, there is a clear distinction between "a failure to consider relevant evidence and a conclusion that such evidence was not mitigating"; the latter determination does not implicate the Constitution. *Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006).

Third, Petitioner contends that the trial court stated it only considered Petitioner's "abusive and neglectful childhood, being a model prisoner, his age, and his unhappy life

---

[16] Petitioner's counsel did not present any argument to the sentencing court regarding the significance of this supplemental mitigation, either in writing (ROA 412-13) or at the final aggravation/mitigation hearing (RT 12/9/92).

experiences." (Dkt. 21 at 48.)  Petitioner suggests the court, therefore, did not consider his father's criminal history, his familial and personal history of alcoholism, and his sister's problems with drugs, alcohol, and attempted suicide.  This Court disagrees.  The trial court's use of the phrase "unhappy life experiences" referred to a broad category of information sufficient to cover all of the topics Petitioner contends were not considered.  Just prior to the quote cited by Petitioner, which only generally categorizes Petitioner's mitigation, the court stated that it, "has considered all those mitigating circumstances set forth in A.R.S. § 13-703(g) and all other testimony offered by the defendant in mitigation, including the evidence and testimony that does not specifically establish or speak directly to any of the statutory mitigating circumstances." (RT 12/9/92 at 74.)  Further, when Petitioner's counsel asked the court to make specific findings as to each mitigating circumstance submitted, the court declined the request and stated:  "[y]ou offered some mitigation.  I referred to it and find having considered **all of it** it's not sufficiently substantial to call for leniency." (*Id.* at 76 (emphasis added).)

It is evident from the record that the trial court did not categorically exclude the presentation or consideration of any type of mitigation.  *See Eddings*, 455 U.S. at 113-14 (holding that court may not refuse to consider mitigating evidence as a matter of law); *Lockett*, 438 U.S. at 608 (holding that statute may not categorically exclude consideration of mitigating evidence).  Further, the court specifically stated that it considered all mitigating evidence presented by Petitioner, *see Parker v. Dugger*, 498 U.S. 308, 314 (1991) (holding that a court is deemed to have taken into account all mitigating evidence where the court so states), and weighed the proven circumstances again the aggravation.  That is all the Constitution requires.  *See Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998).

Moreover, the Arizona Supreme Court conducted a separate, independent review of the aggravating and mitigating factors and determined that Petitioner's death sentence was appropriate.  *Walden*, 183 Ariz. at 620, 905 P.2d at 999.  Even if the trial court had committed constitutional error at sentencing, a proper and independent review of the mitigation and aggravation by the Arizona Supreme Court cured any such defect.  *See*

1   *Clemons v. Mississippi*, 494 U.S. 738, 750, 754 (1990) (holding that appellate courts are able

2   to fully consider mitigating evidence and are constitutionally permitted to affirm a death

3   sentence based on independent re-weighing despite any error at sentencing).

4        The Arizona Supreme Court's denial of this claim was not an unreasonable

5   application of clearly established law.

6        **EXTRA-RECORD EVIDENCE AT SENTENCING – CLAIM 32**

7        Petitioner alleges that the trial court possessed extra-record information prior to

8   sentencing.  He contends that the court's consideration of such evidence without affording

9   him an opportunity to confront it violated his right to a fair and reliable sentencing.

10  Petitioner points to examples in the record in which the sentencing judge acknowledged

11  familiarity with other criminal cases against Petitioner, including the presentence reports

12  from prior convictions.  (*See* RT 10/1/92 at 45; RT 12/9/92 at 16, 18-19.)  The Arizona

13  Supreme Court denied this claim, stating that the court files and presentence reports from

14  Petitioner's other cases were relevant to sentencing on the non-capital counts and the (F)(2)

15  aggravating factor.  *Walden*, 183 Ariz. at 621, 905 P.2d at 1000.

16       In support of this claim, Petitioner relies on *Gardner v. Florida*, 430 U.S. 349, 353,

17  362 (1977).  However, the constitutional violation in that case arose because, in imposing the

18  sentence, the judge considered confidential information not disclosed to the defendant.  *Id.*

19  As clarified by the sentencing court in this case (RT 12/9/92 at 61), the information Petitioner

20  identifies as extra-record consists only of public court files and presentence reports ("PSR")

21  from other cases that were attached to the PSR for the case at issue.  All of this information

22  was available and known to Petitioner.  Thus, the court did not consider any information that

23  was not disclosed.

24       Further, Petitioner was sentenced by a judge, not a jury, and "[t]rial judges are

25  presumed to know the law and to apply it in making their decisions."  *Walton*, 497 U.S. at

26  653.  "Non-statutory" aggravation evidence is not recognized in Arizona; the only

27  aggravating circumstances allowed to support a death sentence are enumerated in the

28  governing statute, A.R.S. § 13-703(F), and the sentencing court may only consider evidence

1   in aggravation that tends to establish a statutory aggravating factor.  *State v. Gulbrandson*,

2   184 Ariz. 46, 66, 906 P.2d 579, 599 (1995); *State v. Atwood*, 171 Ariz. 576, 673, 832 P.2d

3   593, 656 (1992), *overturned on other grounds by State v. Nordstrom*, 200 Ariz. 229, 25 P.3d

4   717 (2001).  Absent evidence to the contrary, a judge is presumed to focus only on relevant

5   sentencing factors.  *State v. Beaty*, 158 Ariz. 232, 244, 762 P.2d 519, 531 (1988).  Petitioner

6   does not identify, and the Court is not aware of, any evidence suggesting that the trial court

7   relied on improper information in finding the aggravating factors; therefore, this Court must

8   presume the judge focused only on relevant evidence.  *See Gretzler v. Stewart*, 112 F.3d 992,

9   1009 (9th Cir. 1997) ("in the absence of any evidence to the contrary, [the Court] must

10  assume that the trial judge properly applied the law and considered only the evidence he

11  knew to be admissible") (citing *Walton*, 497 U.S. at 653).

12      The Arizona Supreme Court's denial of this claim was neither contrary to nor an

13  unreasonable application of federal law.  Petitioner is not entitled to relief on this claim and

14  it is denied.

15          **BRADY VIOLATION AT SENTENCING – CLAIM 33**

16      Petitioner alleges that the State violated *Brady* by its untimely disclosure of police

17  reports regarding his father's criminal record.  On December 1, 1992, eight days prior to

18  sentencing, the State disclosed eighteen pages of criminal records for Petitioner's father,

19  which documented convictions for sex crimes involving minors and public indecency. (ROA

20  412-31.)  The Arizona Supreme Court denied this claim because the State disclosed the

21  evidence, Petitioner did not object to the timing of the disclosure or seek a continuance, and

22  Petitioner failed to explain how the information was mitigating.  *Walden*, 183 Ariz. at 622,

23  905 P.2d at 1001.

24      A successful *Brady* claim requires a showing that (1) the prosecution suppressed

25  evidence, (2) the evidence was favorable to the accused, and (3) the evidence was material

26  to the issue of guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Evidence

27  is material "if there is a reasonable probability that, had the evidence been disclosed to the

28  defense, the result of the proceeding would have been different.  A 'reasonable probability'

1  is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*,

2  473 U.S. 667, 682 (1985); *see also Harris v. Vasquez*, 949 F.2d 1497, 1528 (9th Cir. 1990).

3  "[T]he duty to disclose is ongoing; information that may be deemed immaterial upon original

4  examination may become important as the proceedings progress." *Pennsylvania v. Ritchie*,

5  480 U.S. 39, 60 (1987).  *Brady* is not violated if the information is disclosed at a time when

6  it would be of value to the defendant.  *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004).

7  Petitioner contends the information about his father was critical to defense counsel's

8  theory that Petitioner had been sexually abused as a child, and would have allowed for a

9  proper mental health evaluation and the investigation and presentation of additional

10  mitigation evidence.  The suggestion that Petitioner may have been sexually abused by a

11  family member, his maternal aunt, was first disclosed through testimony given at the

12  November 20 mitigation hearing.  (RT 11/20/92 at 45-47.)  The State disclosed Petitioner's

13  father's criminal records on December 1, a week prior to the final mitigation hearing.

14  Petitioner had the opportunity to and did present that evidence to the court.  *See United States*

15  *v. Woodley*, 9 F.3d 774, 777 (9th Cir. 1993) (*Brady* does not necessarily require that material

16  be produced prior to trial if it is disclosed when still of value).  Petitioner could have sought

17  a continuance if necessary to further develop the evidence.  Additionally, Petitioner's counsel

18  did not present any argument in writing (ROA 412-13) or orally at the final aggravation/

19  mitigation hearing (RT 12/9/92) regarding the relevance of that evidence as mitigation.

20  Because the State complied with its ongoing obligation of disclosure and Petitioner

21  had the information at a time when it could be of value to him – prior to the close of the

22  mitigation presentation and sentencing – there is no *Brady* violation.  The Arizona Supreme

23  Court's denial of this claim was not an unreasonable application of clearly established

24  Supreme Court law.

25  ### PROSECUTORIAL MISCONDUCT AT SENTENCING – CLAIM 34

26  Petitioner alleges prosecutorial misconduct based on the *Brady* violation raised as

27  Claim 33, as well as the prosecutor's reliance on Petitioner's subsequent conviction and

28  pending criminal proceeding, and his statement to the sentencing judge that Petitioner was

1  the "most dangerous man" in Tucson.  The Court has determined that there was no *Brady*

2  violation and will not further discuss that allegation.

3      Clearly established federal law provides that the appropriate standard of federal

4  habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and

5  not the broad exercise of supervisory power."  *Darden v. Wainwright*, 477 U.S. 168, 181

6  (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  Therefore, in order

7  to succeed on this claim, Petitioner must prove not only that the prosecutor's conduct or

8  remarks were improper but that they "so infected the trial with unfairness as to make the

9  resulting conviction a denial of due process."  *Id.*

10     At sentencing, the prosecutor mentioned that since his trial Petitioner had been

11  convicted and sentenced on a separate sexual assault offense; he also informed the court that

12  the conviction was relevant to sentencing on the non-capital counts.  (RT 12/9/92 at 18-19.)

13  The prosecutor also indicated that there was a pending burglary case against Petitioner that

14  the State was going to dismiss.  (*Id.* at 17.)  Although Petitioner argues, without citation, that

15  this evidence was not admissible (Dkt. 124 at 146), the Court finds that the prosecutor's

16  remarks do not entitle Petitioner to relief.  First, the comment regarding the burglary charge

17  was simply a passing reference to clarify on the record that the charge would be dismissed.

18  Second, the Arizona Supreme Court held that the recent sexual assault conviction was

19  relevant under state law to sentencing on the non-capital counts, *Walden*, 183 Ariz. at 621,

20  905 P.2d at 1000; therefore, it was not improper for the prosecution to raise it.  Additionally,

21  the sexual assault charges were mentioned in the PSR and, therefore, already before the

22  court.

23     Petitioner also contends that the following statement by the prosecutor constituted

24  misconduct:  "I truly believe that what you have before you is the most dangerous man that

25  you are going to see in this courtroom, and I would submit to you that Robert Walden, Junior

26  is the most dangerous man in Tucson today."  (RT 12/9/92 at 21.)  The prosecutor clarified

27  the basis for his statement, explaining that Petitioner did not appear to be the kind of person

28  who made women wary and he did not approach people in dark places at night; rather, he had

1   used his employment position to gain access to women's houses in the daytime, and with

2   premeditation sought out circumstances to gain access to women for the purpose of raping

3   and harming them.  (*Id.* at 21-22.)  The Arizona Supreme Court held that the statement was

4   a reasonable inference based on the evidence, and noted that the prosecutor made the

5   statement during argument on the non-capital offenses.  *Walden*, 183 Ariz. at 622, 905 P.2d

6   at 1001.

7       The prosecutor's statement "did not manipulate or misstate the evidence, nor did it

8   implicate other specific rights of the accused such as the right to counsel or the right to

9   remain silent."  *Darden*, 477 U.S. at 182.  Additionally, it was significantly less egregious

10  than the statements in *Darden*, which were condemned by every reviewing court but found

11  not to violate due process.  *Id.* at 179.  In *Darden*, the prosecutor called the defendant an

12  "animal," stated, "I wish I could see [the defendant] sitting here with no face, blown away

13  by a shotgun," and told the jury that imposing the death penalty was the only way to protect

14  society from future crimes.  *Id.* at 180.  Finally, the argument in this case was made to a

15  judge, not a jury, and courts presume that a judge considered only relevant, admissible

16  evidence.  *See Gretzler*, 112 F.3d at 1009 (citing *Walton*, 497 U.S. at 653).

17      In sum, none of the instances that Petitioner cites in this claim rendered his sentencing

18  so fundamentally unfair as to violate due process.  The supreme court's denial of this claim

19  was not objectively unreasonable.

20          **EQUAL PROTECTION REGARDING APPELLATE BRIEF – CLAIM 53**

21      Petitioner alleges that his appellate brief was not treated equally with the State's

22  appellate brief.  This claim was raised in a motion for reconsideration before the Arizona

23  Supreme Court (AP-DKT 43 at 3-4)[17] and was summarily denied (AP-DKT 44).  In denying

24  Petitioner's request to file an over-length brief (AP-DKT 18), the court ordered Petitioner to

25  file opening brief in accord with the applicable eighty-page rule (AP-DKT 20).  The same

26

27

28      [17] "AP-DKT" refers to the docket numbers of documents filed at the Arizona Supreme
    Court during Petitioner's direct appeal, case number CR-92-0530-AP.

1    eighty-page rule applied to the State.  According to Petitioner, "[d]ue to a technicality on

2    format specifications of briefing, the State was able to manipulate its format to be in

3    compliance."  (Dkt. 21 at 94.)  Petitioner thus concedes that the Arizona Supreme Court

4    applied the same rule to both parties.  Additionally, Petitioner makes only a conclusory

5    argument that because of the limitation he had to abandon "critical issues."  He does not

6    identify a single argument that he was forced to forego.  This claim is without merit and is

7    denied.

8

9                                    **CONCLUSION**

10       The Court finds that Petitioner has failed to establish entitlement to habeas relief on

11   any of his claims.  The Court further finds that an evidentiary hearing in this matter is neither

12   warranted nor required.[18]

13

14

15                          **CERTIFICATE OF APPEALABILITY**

16       In the event Petitioner appeals from this Court's judgment, and in the interests of

17   conserving scarce resources that might be consumed drafting and reviewing an application

18   for a certificate of appealability (COA) to this Court, the Court on its own initiative has

19   evaluated the claims within the petition for suitability for the issuance of a certificate of

20   appealability.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir.

21   2002).

22       Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal

23   is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

24   COA or state the reasons why such a certificate should not issue.  Pursuant to 28 U.S.C.

25   § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of

26   _____

27       [18]  The Court previously denied Petitioner's request for evidentiary development as
     to specific claims (Dkt. 147), but conducted an independent review as to all the claims as
28   required by Rule 8 of the Rules Governing Section 2254 Cases.

the denial of a constitutional right."  This showing can be established by demonstrating that

"reasonable jurists could debate whether (or, for that matter, agree that) the petition should

have been resolved in a different manner" or that the issues were "adequate to deserve

encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing

*Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will

issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the

denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

The Court finds that the issues in Claims 1 and 2 are adequate to proceed on appeal.

The Court finds that reasonable jurists, applying the deferential standard of review set forth

in the AEDPA, which requires this Court to evaluate state court decisions in light of clearly

established federal law as determined by the United States Supreme Court, could not debate

its resolution of the merits of Petitioner's remaining claims as set forth in this Order and its

Order of October 6, 2006 (Dkt. 147).  Further, for the reasons stated in the Court's Order

denying Petitioner's motion to amend filed on March 29, 2005 (Dkt. 114), and its Order

regarding the procedural status of Petitioner's claims filed on May 25, 2005 (Dkt. 115), the

Court declines to issue a COA with respect to any claims or portions of claims that were

found to be procedurally barred or for which amendment was denied.

Accordingly,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt.

21) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered on November 15,

1999 (Dkt. 3) is **VACATED**.

**IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the

following issues:

Whether Claim 1 of the Amended Petition – alleging that Petitioner's due process rights were violated by the trial court's denial of his request for severance of the offenses – fails on the merits.

Whether Claim 2 of the Amended Petition – alleging that Petitioner's due

process rights were violated by the pretrial and in-court identifications by Vicki Blanar, Kristina Velasco, Elaine Jordan, and Lynn Carrico – fails on the merits.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 6th day of May, 2008.


_____
Raner C. Collins
United States District Judge